Filed:  June 4, 2002

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 01-1369
(CA-98-2226-B)

Nelson-Salabes, Incorporated,

Plaintiff - Appellee,

versus

Morningside Development, etc., et al.,

Defendants - Appellants.

O R D E R

The court amends its opinion filed March 19, 2002, as follows:

On page 7, footnote 9, lines 5-6 and line 8 -- the references to the Ninth Circuit are corrected to read Second Circuit in the case of Davis v. Gap, Inc., 246 F.3d 152.

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

PUBLISHED

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

NELSON-SALABES, INCORPORATED,
    *Plaintiff-Appellee,*

    v.

MORNINGSIDE DEVELOPMENT, LLC; G.
NEVILLE TURNER,
    *Defendants-Appellants,*

MORNINGSIDE HOLDINGS OF SATYR         No. 01-1369
HILL, LLC,
    *Defendant & Third Party Plaintiff-Appellant,*

    and

THE STRUTT GROUP, INCORPORATED;
GEORGE SALABES,
*Third Party Defendants.*

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Walter E. Black, Jr., Senior District Judge.
(CA-98-2226-B)

Argued: December 5, 2001

Decided: March 19, 2002

Before MOTZ, KING, and GREGORY, Circuit Judges.

_____

Affirmed in part and vacated and remanded in part by published opin-
ion. Judge King wrote the opinion, in which Judge Motz and Judge
Gregory joined.

_____

**COUNSEL**

**ARGUED:** Joshua Jacob Kaufman, VENABLE, BAETJER, HOW-
ARD & CIVILETTI, L.L.P., Washington, D.C., for Appellants. How-
ard Gary Goldberg, GOLDBERG, PIKE & BESCHE, P.C.,
Baltimore, Maryland, for Appellee. **ON BRIEF:** Roger W. Titus,
Kathleen E. Wherthey, VENABLE, BAETJER & HOWARD, L.L.P.,
Rockville, Maryland, for Appellants. Robin G. Banks, GOLDBERG,
PIKE & BESCHE, P.C., Baltimore, Maryland, for Appellee.

_____

## OPINION

KING, Circuit Judge:

Appellants Morningside Development, LLC; Morningside Hold-
ings of Satyr Hill, LLC; and G. Neville Turner (collectively, the "De-
fendants") appeal a judgment of more than $736,000 entered against
them, jointly and severally, following an October 2000 bench trial in
the District of Maryland. The Defendants assert multiple contentions
of error; however, only their challenge to joint and several liability
has merit. As explained below, we otherwise affirm the judgment in
favor of Nelson-Salabes, Incorporated ("NSI"), but we vacate and
remand the district court's imposition of joint and several liability
against Morningside Holdings and Turner.

I.

A.

In the Spring of 1996, the Strutt Group, Incorporated ("Strutt"), a
real estate development company operating in Maryland, sought plan-
ning assistance from NSI, an architectural firm, for a proposed
assisted living facility in Baltimore County, called Satyr Hill Catered
Living ("Satyr Hill" or the "Project"). On June 5, 1996, NSI delivered
to Strutt a proposed letter agreement under which NSI agreed to
develop a schematic building footprint for Satyr Hill.[1] Although Strutt

_____

[1] As a general proposition, a schematic building footprint is a drawing
of a proposed building that shows the building shape in relation to the
property on which it will be constructed and reflects the exterior eleva-
tions for the proposed building.

2

failed to execute this proposed agreement, both NSI and Strutt, as the proposed parties thereto, fully performed according to its terms.

During July 1996, Strutt and NSI continued to engage in discussions concerning the planning and design of Satyr Hill. On July 24, 1996, NSI delivered to Strutt a second proposed letter agreement outlining architectural services it would perform for Strutt in the next phase of development of Satyr Hill. This proposed letter agreement provided that NSI would render additional architectural services to Strutt, that it would develop exterior elevations for the Project, and that it would attend a zoning exception hearing before the Baltimore County Department of Permits and Development Management (the "Zoning Board").[2] Strutt again failed to execute the proposed agreement, but, as with the first proposed agreement, both NSI and Strutt performed according to its terms.

NSI thereafter created four architectural drawings depicting the building footprint, the floor plans, and the exterior elevations of Satyr Hill (the "NSI Drawings"). Strutt's civil engineer then incorporated the NSI Drawings into the development plan for Satyr Hill (the "Development Plan"), which Strutt submitted to the Zoning Board as part of its application for the special zoning exception (the "Zoning Exception"). On April 7, 1997, the Zoning Board granted Strutt's request for the Zoning Exception.

On February 14, 1997, while the Zoning Exception application was pending before the Zoning Board, NSI delivered a third proposed letter agreement to Strutt, by which it offered, inter alia, to create for Strutt the design and working drawings for the remaining development of the Project. This third proposed agreement, which Strutt did not execute, outlined the additional architectural services to be performed by NSI on the Project, and it stated that: "If the above is

_____

[2] In Baltimore County, Maryland, a developer of an assisted living facility must obtain a special zoning exception from the Zoning Board. In order to obtain such a zoning exception, the developer must, among other requirements, submit plans prepared by an architect and a civil engineer, conduct community meetings, and attend a zoning exception hearing before the Zoning Board.

acceptable, we will prepare a Standard AIA Agreement."[3] Thereafter, on September 29, 1997, NSI sent Strutt a revised third letter agreement along with a "revised AIA Contract for Satyr Hill Catered Living per our recent discussions." The AIA Contract that NSI, as the architect, delivered to Strutt, as the owner, provided in relevant part that:

> [t]he Architect's Drawings, Specifications or other documents *shall not be used by the Owner or others* on other projects, for additions to this Project, or *for completion of this Project by others* unless the Architect is adjudged to be in default under this Agreement, *except by agreement in writing and with appropriate compensation to the Architect*

(emphasis added). As with the earlier proposed agreements, Strutt did not execute either the revised third letter agreement or the revised AIA Contract.

On October 7, 1997, Strutt advised NSI to cease its architectural work on Satyr Hill, stating that Strutt's potential business partner had backed out of the Project and that Strutt lacked sufficient expertise to go forward with it. Strutt then inquired as to whether NSI knew of potential purchasers for the Project, and NSI began to solicit potential buyers on behalf of Strutt. One such potential buyer was G. Neville Turner, the President of an entity known as The Morningside Group, and the managing agent of both Morningside Development, LLC ("Morningside Development") and Morningside Holdings of Satyr Hill, LLC ("Morningside Holdings").[4]

_____

[3] A Standard AIA Contract is a form agreement for architectural services developed by the American Institute of Architects ("AIA") for its membership. It sets forth certain uniform terms and conditions normally sought by architects in retainer agreements with their clients, and it often is tailored to meet the requirements of a specific project.

[4] Prior to the development of Satyr Hill, Turner and Morningside Development had been involved in the construction of other assisted living centers in Maryland. In those business arrangements, they would create an entity with Turner serving as its managing agent. This entity would then employ Morningside Development to construct and develop an assisted living facility. In this case, Morningside Holdings was the entity created to own the Project, and Morningside Development was employed by it to develop Satyr Hill.

4

Turner was interested in being involved in the completion of Satyr Hill for multiple reasons, including: (1) the Zoning Board had already granted the Zoning Exception, and (2) the Zoning Board had already approved the Development Plan. On November 18, 1997, Turner provided Strutt with a letter of intent by Morningside Holdings in connection with its proposed purchase of Satyr Hill. At that time, Turner was aware (1) that the NSI Drawings had been incorporated into the Development Plan, and (2) that NSI asserted that any future use of the NSI Drawings required its express consent. Morningside Holdings subsequently agreed to purchase Satyr Hill from Strutt for the sum of $900,000, and the transaction was closed on December 22, 1997.

Thereafter, in January 1998, Turner and NSI met to discuss NSI's future involvement in Satyr Hill. On that occasion, Turner advised NSI that the design of Satyr Hill needed to conform with a prototype established by Morningside Development at other assisted living facilities (the "Prototype"). Turner then informed NSI that it would need to revise the NSI Drawings in order to conform to the Prototype, and NSI indicated that it was willing to make such revisions. After this January 1998 meeting with Turner, NSI became concerned that the Defendants did not intend to continue to utilize it as the architect for Satyr Hill. When Turner confirmed in a later telephone conversation that he was considering other architects, NSI informed Turner that while he could retain and utilize a different architect on the Project, he had no authority to utilize the NSI Drawings, including the building footprint and exterior elevations which had been incorporated into the Development Plan. On January 26, 1998, in order to confirm its position, NSI's attorney wrote to Turner, as "President [of] The Morningside Group," and advised that the NSI Drawings were not to be utilized without NSI's express written consent.

Turner then decided not to retain NSI for any further architectural services with regard to Satyr Hill. Instead, Morningside Development entered into what was called a "design build" contract with Hamil Commercial, Incorporated ("Hamil") for the construction of Satyr Hill, and Hamil retained a different architectural firm, EDG Architects ("EDG").[5] Thereafter, Turner provided Hamil with a copy of the

_____

[5] In their development of other assisted living facilities, Morningside Development and Turner had utilized the services of both Hamil and EDG.

NSI Drawings, as well as with the Development Plan approved by the Zoning Board. In turn, Hamil gave these materials to EDG.

Subsequently, Turner met with EDG and requested that it re-design Satyr Hill to conform to the Prototype. However, he specifically instructed EDG to avoid any modifications to the Development Plan that would necessitate obtaining a new Zoning Exception, because doing so would be both time-consuming and costly. EDG then re-designed Satyr Hill according to Turner's instructions, and EDG's architectural drawings were incorporated into amended development plans for Satyr Hill. The Defendants submitted these amended development plans to the Zoning Board, advising the Board that the amendments were being made, inter alia, for "minor footprint revisions" and "minor changes to architectural elevations of buildings." The Zoning Board approved the amended development plans, and Morningside Development then completed the construction of Satyr Hill.

B.

In July 1998, NSI filed its complaint against the Defendants in the District of Maryland. In an amended complaint filed in March 1999, NSI alleged that the Defendants had infringed upon NSI's copyright[6] in the construction of Satyr Hill by copying the footprint and exterior elevations from the NSI Drawings, in contravention of federal copyright law, i.e., 17 U.S.C. § 501(a).[7] After extensive discovery, this case proceeded to trial before the court in October 2000. After receipt of post-trial briefs, the court, by Opinion filed on February 16, 2001, ruled in favor of NSI and against the Defendants. *Nelson-Salabes, Inc. v. Morningside Holdings of Satyr Hill, L.L.C.*, Opinion, No. B-98-2226 (Feb. 16, 2001) (the "Opinion"). Having found the Defen-

_____

[6] On February 13, 1998, NSI submitted to the United States Copyright Office its certificate of copyright registration for the schematic architectural designs it had prepared for Satyr Hill. In October 2000, the Copyright Office issued NSI its Certificate of Registration (No. VAU 408-645) for the NSI Drawings.

[7] Section 501(a) of Title 17 of the United States Code, in relevant part, provides that "[a]nyone who violates . . . the exclusive rights of the copyright owner . . . is an infringer of the copyright."

dants liable for copyright infringement, the court then analyzed the question of an appropriate damage award, utilizing the provisions of 17 U.S.C. § 504(b).[8]

In so doing, the court first denied NSI's claim for actual damages because it was speculative. Opinion at 23. The court, however, after deducting the expenses incurred by the Defendants in the construction of the Project and deducting the Defendants' profit from the personal property (as opposed to the real property) connected with Satyr Hill, concluded that the Defendants had "realized profits attributable to [their] infringement in the amount of $736,037.45."[9] *Id.* at 27. The court therefore entered judgment against the Defendants, jointly and severally, in that specific sum, plus costs. The Defendants filed a timely notice of appeal from the court's adverse rulings, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

II.

We review for clear error findings of fact made by a district court

_____

[8] Section 504(b) of Title 17 of the United States Code provides in relevant part that:

> [A] copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages.

[9] In calculating the "profits of the infringer that are attributable to the infringement," § 504(b) provides for a two-part procedure. First, the copyright owner is required "to present proof . . . of the infringer's gross revenue." Gross revenue, however, does not mean the infringer's gross revenue from all of its commercial endeavors. Rather, as the Second Circuit recently observed, a copyright owner is only entitled to present the gross revenue for the infringer's line of business or project related to the infringement. *Davis v. Gap, Inc.*, 246 F.3d 152, 160 (2nd Cir. 2001). Second, once the copyright owner has submitted evidence of the infringer's gross revenue, the infringer, pursuant to § 504(b), bears the burden of proving "his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." Thus, under § 504(b), all gross revenue is presumed to be profit "attributable to the infringement," unless the infringer is able to demonstrate otherwise.

sitting without a jury. Fed. R. Civ. P. 52(a); *Scrimgeour v. Internal Revenue*, 149 F.3d 318, 324 (4th Cir. 1998). We may only set aside such a finding when we are left with the definite and firm conviction that a mistake has been made, and we may not do so simply because we might have found to the contrary. *Scrimgeour*, 149 F.3d at 324. On the other hand, when we review the legal conclusions of a district court, we do so on a de novo basis. *Williams v. Sandman*, 187 F.3d 379, 381 (4th Cir. 1999). And in considering mixed questions of law and fact, we review the factual portion of the inquiry for clear error and the legal conclusions de novo. *Gilbane Bldg. Co v. Fed. Reserve Bank of Richmond, Charlotte Branch*, 80 F.3d 895, 905 (4th Cir. 1996).

## III.

The Defendants assert that the district court made three principal errors in entering judgment in favor of NSI. First, they contend that the court erred in finding Morningside Holdings liable for copyright infringement with respect to the NSI Drawings. Second, the Defendants assert that the court erred in concluding that NSI had not granted them an "implied nonexclusive license" to use the NSI Drawings. Finally, they maintain that the court improperly imposed joint and several liability on Morningside Holdings and Turner. We review each of these contentions in turn.[10]

_____

[10] The Defendants raise three other issues on appeal, which we dispose of summarily. They challenge the district court's calculation of the damage award in two respects: (1) they maintain that the court, in calculating the profits attributable to infringement, impermissibly included the value of the personal property at Satyr Hill; and (2) they assert that the court erroneously allowed NSI to present evidence of the gross revenue of the entire Satyr Hill enterprise, rather than limiting the evidence to the gross revenue derived by the Defendants from the infringing portions of Satyr Hill. Neither of these contentions has merit. The court did not include the value of personal property at Satyr Hill in calculating the profits attributable to infringement; thus, the Defendants' first challenge is without basis. With respect to their second contention, the Defendants misapprehend controlling law. As we noted, *see supra* note 9, in order to recover profits attributable to infringement, a copyright owner must submit to the court the gross revenue of the infringer from the project related to the

8

A.

The Defendants first challenge the district court's determination that Morningside Holdings was liable for infringing NSI's copyright. They assert that Morningside Holdings did not infringe on the NSI Drawings; that Morningside Holdings's ownership of the Project is an insufficient basis to establish copyright infringement; and that any of Turner's conduct which constituted copyright infringement was carried out in his capacity as an employee of Morningside Development only, and not in connection with his position at Morningside Holdings.

In order to prove copyright infringement, a plaintiff must show that it owns a valid copyright, and it must establish that the defendant engaged in unauthorized copying of the work protected by the copyright. *Towler v. Sayles*, 76 F.3d 579, 581 (4th Cir. 1996). In this case, it is undisputed that NSI owns a valid copyright for the NSI Drawings. *See supra* note 6. Furthermore, the Defendants have not appealed the court's determination that Morningside Development

_____

infringement. *Davis*, 246 F.3d at 160. In this case, the project related to the infringement was Satyr Hill; therefore, NSI's submission of all of the Defendants' gross revenue from Satyr Hill was proper. As such, the court did not err in its calculation of the damage award.

The Defendants also assert that the court erred by imposing a sanction against them, in the form of the exclusion of certain evidence, for their failure to properly supplement discovery. They contend that the court improperly excluded Turner's testimony on expenses incurred by Morningside Development in constructing Satyr Hill because the details of those expenses had not been properly disclosed. The sanction, however, was pursuant to Rule 37(c)(1) of the Federal Rules of Civil Procedure, which requires witness and information exclusion for an untimely disclosure, unless the violation is substantially justified or harmless. *See* 8A Wright, Miller & Marcus, *Federal Practice and Procedure* § 2289.1 (2d ed. 1994) (collecting cases). The Defendants failed to show that their infraction was substantially justified, and the record supports the court's ruling that the violation was harmful to NSI. As such, the court did not abuse its discretion in its imposition of its sanction. *United States v. Hastings*, 126 F.3d 310, 316 (4th Cir. 1997) (reviewing for abuse of discretion imposition of discovery sanctions).

and Turner engaged in unauthorized copying of the NSI Drawings. At issue, therefore, is the court's conclusion that Morningside Holdings, the owner of the Project, is liable for copyright infringement with respect to the NSI Drawings.

Although Morningside Holdings may not have directly infringed on NSI's copyright, it still can be liable under a theory of vicarious liability by virtue of its relationship with Morningside Development and Turner. The law recognizes that the imposition of liability upon a copyright infringer under a theory of vicarious liability serves an important public interest — it "prevent[s] an entity that profits from infringement from hiding behind undercapitalized `dummy' operations when the copyright owner eventually sues." *Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1150 (7th Cir. 1992). In order to establish vicarious liability, a copyright owner must demonstrate that the entity to be held so liable: (1) possessed the right and ability to supervise the infringing activity; and (2) possessed an obvious and direct financial interest in the exploited copyrighted materials. *See, e.g.*, *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1022 (9th Cir. 2001) (observing that vicarious liability will exist when defendant (1) has right and ability to supervise infringing activity, and (2) has direct financial interest in such activities); *RCA/Ariola Int'l, Inc. v. Thomas & Graystron Co.*, 845 F.2d 773, 781 (8th Cir. 1998) (same); *Hard Rock Cafe*, 955 F.2d at 1150 (same); *Shapiro, Bernstein & Co., Inc. v. H. L. Green Co., Inc.*, 316 F.2d 304, 307 (2nd Cir. 1963) (same). Applying these legal principles to this case, and to the findings made by the district court in its Opinion, Morningside Holdings was properly held liable for the infringement of NSI's copyright.

In its Opinion, the court found, inter alia, (1) that Morningside Holdings possessed the right and ability to supervise the infringing activity of Morningside Development, and (2) that Morningside Holdings had an obvious and direct financial interest in Morningside Development's infringement of NSI's copyright. Opinion at 27-28. Under the evidence, Morningside Holdings owned Satyr Hill, thereby giving it the right and ability to control construction of the Project by Morningside Development. In that connection, its ownership of Satyr Hill provided Morningside Holdings with an obvious and direct financial interest in the infringing activities of Morningside Development.

10

*Id.* That is, Morningside Holdings enjoyed the benefit of any increase in the Project's value resulting from Morningside Development's infringement of the NSI Drawings. In light of the evidence, we are unable to conclude that these findings are clearly erroneous, and we affirm the court's determination that Morningside Holdings is liable to NSI for the infringement of NSI's copyright.

B.

The Defendants next assert that they cannot be held liable for copyright infringement because they enjoyed an "implied nonexclusive license" to use the NSI Drawings. They maintain that the district court erred in concluding to the contrary. Opinion at 18. An implied nonexclusive license, as its designation suggests, is not a written license and can be given either orally or implied from conduct. *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996). Such an implied license does not transfer the ownership of a copyright; rather, it "simply permits the use of a copyrighted work in a particular manner." *Id.* The existence of an implied nonexclusive license, however, constitutes an affirmative defense to an allegation of copyright infringement. In this situation, the Defendants maintain that the totality of NSI's conduct implies the existence of such a license. They particularly rely upon NSI's failure to contractually prohibit the use of the NSI Drawings in its dealings with Strutt, despite knowing that Strutt would sell the Project if it could not obtain financing. As such, the Defendants assert that, as a matter of law, they did not infringe upon NSI's copyright.[11]

Although this Court has not heretofore specifically addressed the question of what circumstances might create an implied nonexclusive license, several of our sister circuits have examined the issue. In so doing, they have utilized versions of the three-part test created by the Ninth Circuit in its decision in *Effects Associates, Inc. v. Cohen*, 908

_____

[11] Because determining whether Strutt enjoyed an implied nonexclusive license to use the NSI Drawings is a mixed question of law (i.e., what is the legal standard for an implied nonexclusive license) and fact (i.e., whether the facts necessary to meet that standard existed), we review the district court's factual findings for clear error and its legal conclusions de novo. *Gilbane Bldg. Co. v. Fed. Reserve Bank of Richmond, Charlotte Branch*, 80 F.3d 895, 905 (4th Cir. 1996).

11

F.2d 555 (9th Cir. 1990). Under the *Effects Associates* test, an "implied nonexclusive license" for use of an otherwise copyright protected work is created "when (1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee copy and distribute his work." *Shaver*, 74 F.3d at 776 (citing *Effects Assocs.*, 908 F.2d at 558-59). Although *Effects Associates* did not deal with architectural drawings, the framework of its three-part test has been applied in several relevant subsequent decisions. *Foad Consulting Group, Inc. v. Azzalino*, 270 F.3d 821, 827-28 (9th Cir. 2001); *Johnson v. Jones*, 149 F.3d 494, 500-01 (6th Cir. 1998); *Shaver*, 74 F.3d at 775-76. Those courts have interpreted the "copy and distribute" prong of the *Effects Associates* test to mean that the creator of a protected work must intend that its copyrighted drawings be used on the project for which they were created, independent of the creator's involvement. *Foad Consulting*, 270 F.3d at 827 n.10; *Johnson*, 149 F.3d at 500; *Shaver*, 74 F.3d at 775-77.

Applying the *Effects Associates* test in this case, it is clear that the potential licensee (Strutt) had requested that the creator (NSI) develop architectural plans for the Project (the NSI Drawings), and that NSI had proceeded to develop the NSI Drawings and deliver them to Strutt. As such, the first two prongs of the *Effects Associates* three-part test are satisfied. Therefore, the determinative question is whether NSI intended that Strutt utilize the NSI Drawings in constructing Satyr Hill, independent of any future involvement by NSI.

An analysis of the three decisions that have interpreted and applied the *Effects Associates* test in the architectural drawings context indicates that we, in assessing whether NSI granted Strutt an implied nonexclusive license, should examine the totality of the circumstances surrounding NSI's conduct. Although application of the totality of the circumstances standard requires that we engage in a broad inquiry, these decisions of the Sixth, Seventh, and Ninth Circuits, each of which involved copyrighted architectural drawings, guide our analysis.

In *Foad Consulting* and *Shaver*, the Ninth and Seventh Circuits concluded that the architects had granted implied nonexclusive licenses for use of their otherwise protected work. *Foad Consulting*,

12

270 F.3d at 832; *Shaver*, 74 F.3d at 776-77. In both of these decisions, architects were hired to perform discrete assignments — in *Foad Consulting*, to develop a "plot plan" for a shopping center, and in *Shaver*, to create schematic design drawings for an airport cargo/hanger building — and there was no indication that the creator and the potential licensee were engaged in anything more than short-term transactions. The contracts in these instances gave no indication that use of the copyrighted materials was contingent on the architects' future involvement in the projects or on their express permission. In fact, neither architect made use of a standard AIA contract which, as noted previously, contains a provision requiring the architect's express permission to use his plans if he is no longer involved in the project. *Foad Consulting*, 270 F.3d at 828-31; *Shaver*, 74 F.3d at 776-77. Moreover, in those two decisions, neither architect's conduct suggested that use of the copyrighted material without the architect's future involvement was prohibited, and in *Shaver* the architect actually made statements indicating that future use was appropriate. *Shaver*, 74 F.3d at 776-77.

The Sixth Circuit, however, in its *Johnson* decision, found that an implied nonexclusive license had not been granted. *Johnson*, 145 F.3d at 501-02. Unlike the architects in *Foad Consulting* and *Shaver*, Johnson had been hired by Jones to design an entire project, her dream home. Although no written contracts were executed between the parties, Johnson had submitted two AIA contracts to Jones, each containing a provision specifically prohibiting any future use of Johnson's architectural drawings in the absence of his future involvement or his express permission. *Id.*

Our analysis of these decisions thus suggests that the existence of an implied nonexclusive license in a particular situation turns on at least three factors: (1) whether the parties were engaged in a short-term discrete transaction as opposed to an ongoing relationship; (2) whether the creator utilized written contracts, such as the standard AIA contract, providing that copyrighted materials could only be used with the creator's future involvement or express permission; and (3) whether the creator's conduct during the creation or delivery of the copyrighted material indicated that use of the material without the creator's involvement or consent was permissible. In *Johnson*, the architect was retained with the understanding that he would develop

13

the project to completion, and his contracts and conduct suggested that any use of his architectural work without his involvement or consent was impermissible. As a result, no implied license was found to exist. On the other hand, as we have pointed out, implied licenses were found to exist in *Foad Consulting* and *Shaver*, where the architects were hired for discrete tasks, with no indication of their further involvement in the project, and where they did not suggest in their proposed contracts or by their conduct that use of the copyrighted material without their involvement was impermissible.

The situation in this case, based on the record presented, falls somewhere between the situation in *Johnson*, on the one hand, and those in *Shaver* and *Foad Consulting*, on the other. Unlike the architect in *Johnson*, NSI was not retained to develop plans for the entire Project and, like the architects in *Shaver* and *Foad Consulting*, NSI created the NSI Drawings pursuant to task-specific contracts. Moreover, as in *Shaver* and *Foad Consulting*, neither of those task-specific contracts contained language prohibiting future use of the architectural drawings without NSI's involvement or consent. In this instance, however, like the architect in *Johnson*, NSI and Strutt plainly contemplated NSI's long-term involvement in Satyr Hill, and they engaged in ongoing discussions for more than nine months concerning NSI's development of the Project. And during those discussions, NSI submitted contracts to Strutt that, similar to those in *Johnson*, contained the standard AIA prohibition against use of the NSI Drawings without NSI's future involvement or its express consent. Indeed, NSI never expressed to Strutt by its representations or conduct that Strutt could utilize NSI's plans without NSI's future involvement or express consent; in fact, NSI specifically advised Strutt to the contrary on at least two occasions.

Reviewed and evaluated in its totality, therefore, Strutt and NSI were engaged in an ongoing relationship that contemplated NSI's future involvement in Satyr Hill. Although the Project was performed in component parts, the facts found by the district court in its Opinion demonstrate that NSI created the NSI Drawings with the understanding that it would participate in the further development of Satyr Hill. Opinion at 17-18. Unlike the architects in *Foad Consulting* and *Shaver*, NSI eventually submitted an AIA agreement to Strutt, and it negotiated for more than nine months with Strutt concerning the work

14

covered by the AIA agreement. In these circumstances, we agree that NSI did not intend for Strutt to utilize the NSI Drawings in the construction of Satyr Hill without NSI's future involvement in the Project or its express consent. Therefore, like the district court, we are "satisfied that these facts do not support a finding that [NSI] granted Strutt [an implied] nonexclusive license." Opinion at 18.[12]

C.

In their final contention on appeal, the Defendants maintain that the court erred by imposing joint and several liability on both Morningside Holdings and Turner, its managing agent, for the full amount of the judgment. We see this as a meritorious contention. The rule that all defendants who engage in the same act of copyright infringement are jointly and severally liable "applies only to the defendant[s'] liability for damages."[13] *MCA, Inc. v. Wilson*, 677 F.2d 180, 186 (2nd Cir. 1981); *see also Fitzgerald Publ'g Co., Inc. v. Baylor Publ'g Co., Inc.*, 807 F.2d 1110, 1116 (2nd Cir. 1986) (imposing joint and several liability on defendants for statutory damages award). As we have previously explained, *see supra* note 9, a defendant in a copyright infringement action may be liable for both "actual damages" and "profits attributable to infringement." 17 U.S.C. § 504(b). The district court, however, found that NSI had suffered no actual damages in this case. Opinion at 23. Therefore, it awarded judgment to NSI solely for the profits of the Defendants attributable to their infringement of the NSI Drawings. In such situations, each defendant is only liable to the copyright plaintiff to the extent of its own profits derived from the infringing activity; thus, as the Second Circuit has held, in the copyright infringement context "one defendant is not liable for the profit made by another." *MCA*, 677 F.2d at 186; *see also Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 519 (9th Cir. 1985) ("When a copyright is infringed, all infringers are jointly and sever-

_____

[12] Because an implied nonexclusive license did not exist, we need not address the question of whether Strutt could transfer any such license to the Defendants.

[13] Joint and several liability means that "[t]he person who has been harmed can sue and recover from both wrongdoers or from either one of the wrongdoers." Black's Law Dictionary 914. Thus, if two parties are jointly and severally liable, each is responsible for the liability of both.

ally liable for plaintiffs' actual damages, but *each defendant is sever-ally liable for his or its own illegal profit; one defendant is not liable for the profit made by another*." (emphasis added)); 3 Nimmer on Copyright § 12.04[C][3], at 12-50.

Although defendants in copyright infringement proceedings are generally not jointly liable for profits, a long-standing exception to this rule exists when such defendants act as partners or as "practical partners." *Frank Music*, 772 F.2d at 519 (citations omitted). When a court finds the existence of a partnership or a "practical partnership," the "partners" thereof are jointly and severally liable for any profits that they collectively derived from the acts of copyright infringement. *Id.* (concluding that entity's role in activity, degree of direction of activity, and financial interest in activity were relevant in addressing the existence of a practical partnership); *see Belford, Clarke & Co. v. Scribner*, 144 U.S. 488, 507-08 (1892) (deciding that printer was jointly liable for publisher's profits from infringing book because printer and publisher were "practical partners").

In this situation, the court imposed joint and several liability on the Defendants for the full value of their aggregate profits. The court, however, did not support its imposition of such liability by making the necessary predicate finding that the Defendants had been engaged in a "practical partnership." As such, we must vacate the imposition of joint and several liability on Morningside Holdings and Turner, and we remand this aspect of their appeal for any further proceedings that may be appropriate.[14]

IV.

For the foregoing reasons, we affirm the judgment of the district court, except for its imposition of joint and several liability on Morn-

_____

[14] The Defendants did not appeal the imposition of joint and several liability on Morningside Development. As such, we leave this aspect of the judgment undisturbed.

16

ingside Holdings and Turner, and on that aspect of the appeal we vacate and remand.

*AFFIRMED IN PART AND VACATED*<br>*AND REMANDED IN PART*

17