UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 08-2103

THOMAS M. GILBERT ARCHITECTS, P.C.,

Plaintiff - Appellee,

v.

ACCENT BUILDERS AND DEVELOPERS, LLC, a Virginia limited
liability company; DESIGN CUSTOM BUILDERS, INCORPORATED, a
Virginia corporation; MICHAEL TUMMILLO,

Defendants - Appellants.

Appeal from the United States District Court for the Eastern
District of Virginia, at Richmond.  James R. Spencer, Chief
District Judge.  (3:07-cv-00699-JRS)

Argued: October 28, 2009              Decided:  May 6, 2010

Before MICHAEL, Circuit Judge, HAMILTON, Senior Circuit Judge,
and Jane R. ROTH, Senior Circuit Judge of the United States
Court of Appeals for the Third Circuit, sitting by designation.

Affirmed by unpublished per curiam opinion.

**ARGUED:** James Edward Moore, CHRISTIAN & BARTON, LLP, Richmond,
Virginia, for Appellants.  Christopher E. Gatewood, HIRSCHLER
FLEISCHER, PC, Richmond, Virginia, for Appellee.  **ON BRIEF:**
David B. Lacy, CHRISTIAN & BARTON, LLP, Richmond, Virginia, for
Appellants.  R. Webb Moore, HIRSCHLER FLEISCHER, PC, Richmond,
Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Thomas M. Gilbert Architects, P.C. (Gilbert) sued Accent Builders and Developers, LLC (Accent), Design Custom Builders, Inc., and Michael Tummillo alleging infringement of a copyright in certain architectural plans (Plans). The district court granted summary judgment to Gilbert on liability. After a bench trial on damages, the district court awarded Gilbert $5,300 in actual damages, $224,894 in profits, and a permanent injunction enjoining defendants' further use of the Plans. On appeal defendants argue that the district court improperly granted summary judgment on their affirmative defenses and improperly refused to subtract their operating expenses when it awarded damages for profits. We reject defendants' arguments and affirm.

## I.

The Plans were originally created pursuant to a written agreement between a third party, Aspect Properties, LLC (Aspect), and Gilbert. The agreement, entered into on July 26, 2002, required Gilbert to provide the Plans to Aspect in two stages for the purpose of constructing 42 townhouses. In the first stage Gilbert would provide schematic drawings for three model townhouses for a fee of $7,500. In the second phase Gilbert would provide any remaining architectural documents

3

necessary for construction, including floor plans, front and rear elevations, and three foundation plans, all for a fee of $17,700. The agreement specified that all documents comprising the Plans "remain the property of Thomas M. Gilbert, Architect, P.C." J.A. 316. It also specified that "[t]he fee for reuse of the documents will be two hundred fifty dollars (250.00) per unit and any changes requested will be on an hourly basis." J.A. 315. Gilbert delivered the Plans pursuant to the agreement, and Aspect paid Gilbert in full. The documents Aspect received contained the following copyright notice:

> THOMAS M. GILBERT, ARCHITECT, P.C. EXPRESSLY RESERVES ITS COMMON LAW COPYRIGHT OR OTHER PROPERTY RIGHTS IN THESE PLANS. THESE PLANS ARE NOT TO BE REPRODUCED, CHANGED, OR COPIED IN ANY FORM OR MANNER WHATSOEVER, NOR ARE THEY TO BE ASSIGNED TO ANY THIRD PARTY, WITHOUT FIRST OBTAINING THE EXPRESS WRITTEN PERMISSION AND CONSENT OF THOMAS M. GILBERT, ARCHITECT, P.C.

J.A. 566-76.

Sometime in 2002 Tummillo partnered with Aspect to pursue the townhouse project. On May 29, 2003, Aspect's owners formed Accent as a vehicle to complete the project, and Tummillo acquired an ownership interest in Accent the same year. In 2004 Tummillo acquired complete ownership of Accent and the project. By that time Gilbert had already delivered the Plans, and Aspect's owners required Tummillo to pay the balance owed Gilbert and to reimburse them for the amounts already paid.

4

Tummillo later asked Gilbert to make certain changes to the Plans. The changes consisted mainly of moving the rear wall of the townhouses back three feet and relocating the fireplace from the corner to the rear wall. Gilbert had known of Tummillo's association with the project for some time prior to the request, but it was not until Tummillo made the request for changes that he became aware that Tummillo had acquired full ownership. On September 11, 2006, Gilbert sent a proposal to Tummillo offering to make the requested changes and conduct a building code review for $14,000. Gilbert included a code review in his offer because, in his opinion, the original Plans could not have been used because of recent changes to the building code. Tummillo believed that Gilbert's price was too high and made the changes himself by hand without further input from Gilbert. When Tummillo submitted the Plans for approval with the County, he removed all references to Gilbert on the Plans, including the copyright notice.

After the County approved the Plans, defendants began construction of the townhouses. Over the course of construction, defendants made copies of the Plans for various suppliers and contractors. In June 2007 Gilbert learned that construction had commenced using the modified Plans. He registered his original plans with the United States Copyright Office and, on September 14, 2007, sent a cease-and-desist

letter to defendants. After Gilbert was unable to resolve the dispute, he filed this lawsuit for copyright infringement on November 9, 2007.

The district court granted Gilbert summary judgment on infringement, rejecting defendants' affirmative defenses of implied license, fair use, and copyright misuse. In the summary judgment order the district court excluded the proposed testimony of defendants' architect-expert, who would have testified that Gilbert made an excessive fee proposal for modifying the Plans. The parties stipulated that Gilbert's actual damages were $5,300 and agreed to a bench trial on the remaining issues pertaining to relief. At trial defendants introduced testimony from Kevin Perlowski, their accountant. Although 42 townhouse units were planned, only one six-unit building had been completed and only two of those units had been sold. Perlowski testified that defendants had incurred $181,659 in direct costs and $8,795 in closing costs for the first unit, which sold for $328,000. Similarly, defendants had incurred $189,620 in direct costs and $22,982 in closing costs for the second unit, which sold for $299,950. If profit is calculated by simply subtracting direct and closing costs from gross revenues, defendants' profit on the two units would be $224,894. Defendants also incurred significant operating expenses, however, during construction. Perlowski testified that pursuant

6

to generally accepted accounting principles (GAAP) the entirety of these operating expenses, along with direct and closing costs, must be subtracted from gross revenue to calculate profit. After subtracting these operating expenses, defendants' profits on the two units is reduced to zero, according to Perlowski.

The district court's findings of fact and conclusions of law included (1) an award to Gilbert of $5,300 in statutory damages and $224,894 in infringing profits from defendants' use of the Plans and (2) a permanent injunction against defendants' further use of the Plans. In rejecting defendants' calculation of zero profits, the district court held that defendants had failed to meet their burden of establishing their operating expenses with sufficient precision. This appeal followed.

II.

Defendants argue that they should not be liable for infringement because the district court, at the summary judgment stage, improperly dismissed their affirmative defenses of (1) implied license, (2) fair use, and (3) copyright misuse. We review de novo the grant of summary judgment dismissing these defenses. Stonehenge Eng'g Corp. v. Employers Ins. of Wausau, 201 F.3d 296, 301 (4th Cir. 2000).

7

A.

Defendants' primary argument is that "Gilbert implicitly granted a nonexclusive license to use, modify, copy and distribute the Plans as necessary to complete the Project." Br. of Appellants at 21. "The existence of an implied nonexclusive license . . . constitutes an affirmative defense to an allegation of copyright infringement." Nelson-Salabes, Inc. v. Morningside Dev., LLC, 284 F.3d 505, 514 (4th Cir. 2002). The grant of a nonexclusive license is essentially a promise not to sue for infringement. See U.S. Philips Corp. v. Int'l Trade Comm'n, 424 F.3d 1179, 1189 (Fed. Cir. 2005). When such a promise is implied, courts generally enforce it according to the rules governing quasi-contract and contracts implied-in-fact. See Wrench v. Taco Bell Corp., 256 F.3d 446, 456-57 (6th Cir. 2000) (noting that Michigan law governs a contract for copyrighted material that was implied-in-fact as distinguished from one that was implied-in-law); I.A.E., Inc. v. Shaver, 74 F.3d 768, 776 (7th Cir. 1996). In this circuit an implied non-exclusive license exists and is enforceable when:

> (1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee copy and distribute his work.

Nelson-Salabes, Inc., 284 F.3d at 514 (quoting I.A.E., Inc., 74 F.3d at 776).

8

The case law does not make clear whether the source of these rules is state or federal law. Nelson-Salabes is our only published decision to address the implied license defense to copyright infringement, and it does not trace the rules' source to either body of law. The absence of citation to state law suggests that we assumed federal law applied. However, in Foad Consulting Group, Inc. v. Azzalino — a case cited in Nelson-Salabes and applying the same rule — the Ninth Circuit expressly declared that state law governed "so long as it does not conflict with the Copyright Act." 270 F.3d 821, 827 (9th Cir. 2001). Judge Kozinski, a member of the panel in Foad, concurred in the result, drawing a distinction between contracts implied-in-fact and those implied-in-law. He believed that implied licenses generally fell into the latter category as "incident[s] of copyright" and therefore should be governed by federal law. Id. at 832.

We need not resolve the source-of-law issue to decide the case before us. First and foremost, we see nothing in state law that conflicts with the three-element test adopted in Nelson-Salabes. In evaluating the test's third element when a written contract exists, we conclude the applicable rule — whether under Virginia law or federal common law — is that: (1) quasi-contract principles do not govern, Nedrich v. Jones, 429 S.E.2d 201, 207 (Va. 1993); WRH Mortgage, Inc. v. S.A.S.

9

Assocs., 214 F.3d 528, 534 (4th Cir. 2000); and (2) the parties' intent "should be ascertained, whenever possible, from the language the parties employed in the contract," Virginia Elec. and Power Co. v. Norfolk S. Ry. Co., 683 S.E.2d 517, 525 (Va. 2009). See also United States v. Kimbell Foods, Inc., 440 U.S. 715, 728 (1979) ("[W]hen there is little need for a nationally uniform body of law, state law may be incorporated as the federal rule of decision."). We note that in Nelson-Salabes we held that courts "should examine the totality of the circumstances" when determining intent. Id. at 515. But on this point Nelson-Salabes is distinguishable because there was no written agreement between the parties in that case. While the Nelson-Salabes standard for determining intent is eminently reasonable in the absence of a written agreement, the same cannot be said when one exists, as it did between Gilbert and Aspect.

We first examine whether Gilbert granted Aspect a nonexclusive license to modify the Plans and use them as modified. The parties raise and discuss in varying detail the possibility that, because the original agreement was between Gilbert and Aspect, only Aspect could have had such a license. If, however, Aspect did not have a license to modify the Plans, defendants could not have had one. Accordingly, we consider whether Aspect had non-exclusive license.

10

The parties dispute only the third element of the test adopted in Nelson-Salabes: whether Gilbert intended to grant Aspect a nonexclusive license to modify the Plans and use them as modified. As discussed above, the threshold question we must answer is whether Gilbert and Aspect's intent can be ascertained from the text of the agreement. We conclude that it can and that Aspect's license extended only to copying and using the original Plans for construction of the townhouses. Reading the document as a whole, it is clear that Gilbert must have at least granted Aspect a limited license to copy and use. The Plans would be utterly useless to Aspect unless it had permission to use the Plans for construction of the townhouses and to make copies for its contractors as needed. See Effects Assocs., Inc. v. Cohen, 908 F.2d 555, 558-59 (9th Cir. 1990) (finding an implied license when the absence of one would render the author's contribution "of minimal value"). Moreover, to read the agreement as requiring Aspect to pay $25,200 in fees for useless documents would threaten the enforceability of the contract for failure of consideration. See Waskey v. Thomas, 235 S.E.2d 346, 349 n.2 (Va. 1977).

The agreement does, however, expressly reserve ownership of Gilbert's copyright in the Plans by declaring that they "remain the property of Thomas M. Gilbert, Architect, P.C." J.A. 316. While an express reservation of ownership in the

11

Plans' copyright is not dispositive of the licensing issue, see Foad Consulting Group, Inc., 270 F.3d at 830, at a minimum it evinces an intent to grant, at best, a limited license. Indeed, the limited nature of the license is evident in the agreement's provision on reuse and changes: "The fee for reuse of the documents will be two hundred fifty dollars (250.00) per unit and any changes requested will be on an hourly basis." J.A. 315.

The reuse and changes provision clearly evinces Gilbert and Aspect's intent that Aspect not have permission to modify the Plans and use the Plans as modified without Gilbert's involvement. Were it not intended to circumscribe Aspect's license to use the documents, it would have no meaning. If, for example, Gilbert had not intended to retain its rights to derivative works based on the Plans, it would not have needed to include a clause providing for changes. Aspect could have hired Gilbert to make the changes or not, but the choice would have been left entirely with Aspect. Similarly, it is hard to imagine that Gilbert would charge a fee for reuse of the Plans — as for construction of townhouses besides the original 42 — but not expect compensation for modifications.

Defendants' arguments to the contrary rest primarily on what the agreement does not say rather than what it does say. They rely largely on the factors mentioned in Nelson-Salabes for

12

assessing intent in the totality of the circumstances. As we have noted, Nelson-Salabes's totality of the circumstances analysis does not apply when there is a valid, written agreement between the parties. The only argument that defendants make based on the text of the agreement is that it "lack[s] any . . . provision forbidding Aspect, or anyone else, from using the Plans to complete the Project without Gilbert's involvement or express consent." Br. of Appellants at 25. In making this argument, defendants appear to assume, wrongly, that a broad implied license is presumed in contracts for architectural plans. No such presumption exists, and even if it did, the agreement's restrictive language concerning reuse and changes would overcome it.

Because Gilbert and Aspect's intent is clear from the language of the agreement, no genuine issue of material fact exists. Aspect did not have a license to modify the Plans and use them as modified, and therefore could not have had such a license. Accordingly, we affirm summary judgment on defendants' implied license defense.

B.

Defendants' fair use and copyright misuse defenses are more easily dispatched. Long a common law doctrine, fair use was codified in the Copyright Act of 1976 under 17 U.S.C. § 107. Cambell v. Acuff-Rose Music, 510 U.S. 569, 577 (1994). Section

13

107 lists four factors for courts to consider in determining whether a particular use is fair use:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. In their briefs defendants make no attempt to consider the first three factors, relying exclusively on the fourth. Defendants argue that a jury could have reasonably concluded that the changes Tummillo made to the Plans were "minor field changes." Reply Br. of Appellants at 14-15. Because Gilbert admitted that it does not expect to be compensated for minor field changes, defendants contend that a jury could have concluded that there was no potential market upon which Tummillo's changes could have had an effect. Based on this factor alone, defendants argue that the district court erred.

We reject this argument and adopt the district court's more careful analysis. We agree with the district court that the first three factors weigh against fair use because defendants' use of the Plans was entirely commercial, because architectural plans are generally regarded as creative works,

14

and because defendants' use of the Plans was admittedly substantial. As for defendants' argument that there was no potential market for the changes Tummillo made, defendants point to no evidence that these changes were in fact "minor field changes." Bald characterizations are not evidence. What evidence does exist suggests that Gilbert regularly charged for the kind of changes Tummillo made and that Tummillo himself described them as "structural changes" for which he could be held liable if something went wrong. J.A. 225. Accordingly, we affirm the district court's grant of summary judgment on defendants' fair use defense.

Defendants' copyright misuse argument amounts to a claim that Gilbert demanded too high a price for the changes Tummillo requested. Defendants cite no authority for this proposition apart from a passage, taken out of context, from the Ninth Circuit's decision in <u>Foad</u>. Nowhere in <u>Foad</u> does the Ninth Circuit discuss the defense of copyright misuse, and we have found no precedent lending support to defendants' argument. Accordingly, we affirm the district court's grant of summary judgment on defendants' copyright misuse defense.[*]

---

[*] We note that defendants' copyright misuse defense would fail regardless of the testimony of their expert J. Baxter Bailey because the defense is legally incoherent in these circumstances. Because Bailey's testimony was relevant only to
(Continued)

15

III.

The sole issue that the parties dispute with regard to damages is whether the district court should have deducted defendants' operating expenses from gross revenue when calculating the award for infringing profits. Section 504 of the Copyright Act provides that

> In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

17 U.S.C. § 504(b). We have previously held that § 504 "creates an initial presumption that the infringer's profits . . . attributable to the infringement are equal to the infringer's gross revenue." Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 520 (4th Cir. 2003) (internal quotations and citations omitted). "Once the copyright owner has established the amount of the infringer's gross revenues, the burden shifts to the infringer to prove either that part or all of those revenues are deductible expenses . . . ." Id. (internal quotations and citations omitted). If the infringer wishes to establish that its operating expenses are deductible expenses,

---

defendants' copyright misuse defense, we also affirm the district court's exclusion of his testimony.

16

it has the "burden of proving that each item of general expense contributed to the production of the infringing items, and of further offering a fair and acceptable formula for allocating a given portion of overhead to the particular infringing items in issue." In Design v. K-Mart Apparel Corp., 13 F.3d 559, 565-66 (2d Cir. 1994) (quoting 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 14.03[B] (1993)).

We agree with the district court that defendants simply failed to carry their burden of allocating that portion of their operating expenses attributable to the two units that were sold. In fact, Perlowski specifically admitted that he made "no attempt to allocate operating expenses to a particular unit." J.A. 469. Defendants respond that Perlowski was merely following GAAP in deducting the entirety of defendants' operating expenses from their revenues on the two units sold. GAAP, however, is not the law here. There are likely many good reasons why the GAAP rules are as they are, but those reasons do not necessarily coincide with the reasons bearing on assessing damages for copyright violations. As Gilbert notes, for example, some of defendants' operating expenses went towards developing the land on which the 42 townhouses were to be built and have no relation to defendants' infringing acts. Because each item of deductible expense must contribute to the

17

infringing products, at least some of defendants' operating expenses as calculated cannot be deducted from gross revenues.

Finally, we reject defendants' argument that the district court should have assumed the burden of allocation itself. Section 504 is clear that the burden of proving deductible expenses lies with defendants. Despite defendants' assertions, the Second Circuit's decision in In Design does not hold otherwise. In that case, the infringers did provide a formula for allocating overhead, and the Second Circuit affirmed the district court's acceptance of that formula. In Design, 13 F.3d at 566. While we do not go so far as to hold that it would have been error for the district court to have allocated on its own initiative, we cannot say that failing to do so was error. Accordingly, we affirm the district court's award of infringing profits in the amount of $224,894.

IV.

For the reasons stated above, the judgment of the district court is

AFFIRMED.