Present: Hassell, C.J., Koontz, Kinser, Lemons, and Millette, JJ., and Russell and Lacy, S.JJ.

VIRGINIA ELECTRIC
 AND POWER COMPANY, ET AL.

OPINION BY SENIOR JUSTICE
v.  Record No. 081294            ELIZABETH B. LACY
                                 September 18, 2009
NORFOLK SOUTHERN RAILWAY COMPANY

FROM THE CIRCUIT COURT OF HALIFAX COUNTY
William R. Shelton, Judge Designate


     This appeal arises from a contract dispute between a railway company and two utility companies over periodic cost adjustments of rates charged by the railway company for transportation of coal to an electricity generating facility in Halifax County.  The principal issue we consider is whether the circuit court correctly determined that the contract in question was unambiguous in requiring the application of a specific rail cost adjustment factor for calculating quarterly adjustments to the coal transportation rates.  We also consider whether the circuit court erred in striking certain affirmative defenses raised by the utilities to the railway company's claim for breach of the contract and subsequently entering a judgment of more than $77 million plus interest in favor of the railway company.

                          BACKGROUND

     The essential facts are not in dispute.  On April 5, 1989, Old Dominion Electric Cooperative ("ODEC") entered into a

contract with Norfolk and Western Railway Company, the predecessor in interest to Norfolk Southern Railway Company ("Norfolk Southern"), for the regular transportation of coal to an electricity generating facility ODEC was constructing in Clover, Virginia. ODEC subsequently sold an undivided one-half interest in the Clover facility to Virginia Electric and Power Company ("VEPCO").[1]

The contract, which was styled as a "Coal Transportation Agreement" ("CTA"), addressed the transportation rates for coal deliveries to the Clover facility in Article 25, which provided in relevant part:

> Unless specified otherwise, all rates and charges in this Agreement shall be subject to adjustment in accordance with this Article. Rate adjustments shall be based upon the ICC generated RCAF. During the term of this Agreement, should the RCAF described in this Agreement . . . be modified or changed other than renormalizing, a new factor which closely tracks the RCAF shall be agreed to by the Parties.
>
> . . . .
>
> The amount of each such adjustment shall be determined according to the applicable procedures prescribed by the ICC in Ex Parte No. 290 (Sub. No. 2) and published in Title 49 C.F.R., Part 1102, Section 1102.1 and Interstate Commerce Act, Section 10707, as may be amended, incorporated herein by reference.

---

[1] There is no dispute that VEPCO and Norfolk Southern are the real parties in interest in this contract dispute. Accordingly, we will refer hereafter to ODEC and VEPCO where context permits as "the utilities" and the contracting railway company as "Norfolk Southern."

The CTA defines the term "RCAF" as the Rail Cost Adjustment Factor, as "prescribed by the ICC in Ex Parte No. 290."[2]  The ICC-generated RCAF refers to an index for coal transportation rates first established pursuant to Section 203 of the Staggers Rail Act of 1980.  See former 49 U.S.C. § 10707a(a)(2)(B) (1980).  In general, the purpose of the index was to create a calculation methodology by which rail freight delivery rates in long-term contracts could be adjusted for evolving costs and, where required to be applied, such rates would be protected from challenge as to their reasonableness.  Railroad Cost Recovery Procedures–Productivity Adjustment, Ex Parte No. 290 (Sub. No. 4), 5 I.C.C.2d 434 (1989).

Accordingly, the ICC initiated regulatory proceedings designated "Ex Parte No. 290 (Sub. No. 2)" in which it developed first an interim, and later a final, RCAF index.  See Railroad Cost Recovery Procedures, Ex Parte No. 290 (Sub. No. 2), 1 I.C.C.2d 207 (1984) (establishing the final index); Railroad Cost Recovery Procedures, Ex Parte No. 290 (Sub. No. 2), 364 I.C.C. 841 (1981) (creating the interim index).  The RCAF index established in Ex Parte No. 290 (Sub. No. 2) did not use rail

---

[2] The parties agree that when the United States Congress abolished the ICC in 1995, the function of calculating and publishing RCAF indices was transferred to the Surface Transportation Board.  See Pub. L. No. 104-88 § 102, 109 Stat. 803, 822-29 (1995), codified in part at 49 U.S.C. §§ 10101 et seq.

3

productivity as an element of the calculation used for determining the adjustment factor for rail rates. See Railroad Cost Recovery Procedures–Productivity Adjustment, Ex Parte No. 290 (Sub. No. 4), 5 I.C.C.2d 434 (noting that in the original rail cost adjustment factor the Commission "considered, but rejected, proposals to . . . recogniz[e] the impact of improved productivity on the cost of rail outputs"). This version of RCAF became known as the Rail Cost Adjustment Factor-Unadjusted ("RCAF-U").

On March 22, 1989, the ICC adopted a modified RCAF index that was based on RCAF-U, but further adjusted that index by accounting for improvements in rail productivity. Railroad Cost Recovery Procedures–Productivity Adjustment, Ex Parte No. 290 (Sub. No. 4), 5 I.C.C.2d 434. This cost adjustment factor became known as the Rail Cost Adjustment Factor-Adjusted ("RCAF-A"). RCAF-A was created in a separate sub-docket of Ex Parte No. 290 from RCAF-U, and modifications to RCAF-U continued independently from the calculation of RCAF-A. See, e.g., Railroad Cost Recovery Procedures, Ex Parte No. 290 (Sub. No. 2), 6 I.C.C.2d 956 (1990) (adopting change in materials and supplies component of RCAF-U); see also Edison Electric Inst. v. ICC, 969 F.2d 1221, 1222, 1230 (D.C. Cir. 1992) (holding that, although the Act neither prohibited nor required a productivity adjustment, the ICC was statutorily authorized and properly

exercised its discretion to prospectively improve RCAF by a productivity adjustment).

Although RCAF-A is presently the only index permitted to be used in regulated rail transportation contracts that must apply a rate adjustment factor, Congress requires the Surface Transportation Board, the successor to the ICC, to continue to publish both the RCAF-U and RCAF-A indices, recognizing that there are contracts remaining in force that use RCAF-U and parties to unregulated contracts may continue to use RCAF-U as the basis for rate adjustment provisions if they choose to do so. See 49 U.S.C. § 10708 (2006); see also Burlington N. R.R. Co. v. Nebraska Pub. Power Dist., 931 F. Supp. 1470, 1476 (D. Neb. 1996) (noting that "[t]he ICC has remained neutral about whether particular [unregulated] contracts required the use of RCAF(U) or RCAF(A)").

In the present case, the parties agree that at the time the CTA was executed, they were free to select either RCAF-U or RCAF-A to adjust the rates to be charged under the CTA. It is also not disputed that because of the differences in the method of calculating the two indices, use of RCAF-U for adjusting coal transportation rates under the CTA would result over time in significantly higher amounts being owed by the utilities to Norfolk Southern than would be owed under rates adjusted by RCAF-A.

On June 29, 1989, William B. Bales, Norfolk Southern's Vice President for Coal and Ore Traffic, sent a memorandum to ODEC detailing the quarterly rate adjustment for transportation of coal under the CTA.  In each subsequent quarter thereafter through the third quarter of 2003, Bales or another Norfolk Southern executive prepared and transmitted to ODEC a similar memo detailing the adjusted coal transportation rates for the Clover facility for the upcoming quarter.  Although none of the memoranda indicated specifically whether the adjustment factor being used to determine the rates was RCAF-U or RCAF-A, beginning with the fourth quarter of 1991, Bales referred in his cover memo to the contract providing for "an adjustment of 50% of the adjusted RCAF" as the basis for determining the coal transportation rates for the Clover facility.  (Emphasis added.)

In September 1993, VEPCO and Norfolk Southern held negotiations in an effort to form a separate contract for transportation of coal to the Clover facility.  Among other matters, VEPCO and Norfolk Southern specifically discussed changing the rate adjustment factor under the CTA to "75% of the Unadjusted RCAF."  Despite these negotiations, no new contract was agreed upon, and all coal subsequently transported to the Clover facility by Norfolk Southern remained subject to the provisions of the CTA, and all adjustments to the coal

6

transportation rates under the CTA before December 1, 2003 were made using RCAF-A to calculate the quarterly change in the rate.

In a letter dated October 17, 2003 which summarized communications made in a meeting on October 14, 2003, Thomas E. Rappold, Norfolk Southern's Assistant Vice President for Utility and Industrial Coal Marketing, advised Jeff Dowhan, the Coal Contracts Manager for Dominion Resources, Inc., the parent company of VEPCO, that Norfolk Southern intended to begin making quarterly adjustments to the coal transportation rates under the CTA using RCAF-U, and that all deliveries beginning on December 1, 2003 would be subject to these higher rates. In that letter, Rappold "acknowledged that, when RCAF-A was first introduced, [Norfolk Southern] applied this index for what was intended to be the short-term benefit of [the] Clover [facility]." Rappold maintained, however, that the CTA "contract language specifies use of RCAF-U," and that "due to [Norfolk Southern's] attention to other matters, the benefit of RCAF-A was extended to [the utilities] far longer than anticipated" resulting in an "extraordinary windfall" to the utilities.

The utilities rejected Norfolk Southern's assertion that RCAF-U could be used to adjust transportation rates under the CTA and this litigation ensued.

PROCEEDINGS

7

On November 26, 2003, the utilities filed in the circuit court a bill of complaint seeking a declaratory judgment that the CTA unambiguously specified use of "the Contract ratio" as the rail cost adjustment factor and sought specific performance of the contract for future transportation of coal to the Clover facility applying rates adjusted by "the Contract ratio." The utilities argued that the "Contract ratio" referred to in the Bill of Complaint was RCAF-A. The Bill of Complaint, however, did not state that the CTA required the use of RCAF-A; rather, it stated that the CTA contained a "Contract ratio" that was to be applied. The utilities alleged that the representations made by Norfolk Southern at the October 14, 2003 meeting constituted an anticipatory breach of the CTA and that using RCAF-U to adjust the future coal transportation rates "would wrongfully inflate [the utilities'] rates by hundreds of millions of dollars."

Norfolk Southern filed a demurrer to the bill of complaint, asserting that the utilities had failed to state a claim upon which relief may be granted because the CTA was unambiguous in requiring the utilities to pay for the transportation of coal to the Clover facility in accord with the application of RCAF-U in the quarterly adjustment of coal transportation rates. Norfolk Southern also filed an answer and cross-bill seeking a declaratory judgment and specific performance of the CTA using

8

RCAF-U to adjust the future coal transportation rates.[3]  Norfolk Southern also sought damages for breach of contract "for all amounts underpaid by [the utilities] since December 1, 2003" and "interest on all such amounts."

Following a hearing, limited to the issue of determining whether the CTA specified the use of RCAF-U or RCAF-A as the rate adjustment factor, the circuit court issued an opinion letter dated December 22, 2004.  In that opinion letter the court found that "the language of [the CTA] is clear and unambiguous" and that Article 25 "refers to the unadjusted Rail Cost Adjustment Factor."  The court further opined that it was "not convinced that a latent ambiguity exists, or that the RCAF-A is an amendment to the RCAF-U as contemplated by the contract."  An order embodying this ruling and granting Norfolk Southern's demurrer was entered nunc pro tunc March 9, 2005.

In an order entered February 11, 2005, the circuit court denied the utilities' motion for leave to amend their bill of

---

[3]The pleading was styled as an "answer and counterclaim," but the style was subsequently amended to "answer and cross-bill" to reflect that the action had been brought on the equity side of the court's docket.  This action was brought before we amended our rules, effective January 1, 2006, effectively abolishing the division of trial court dockets into legal and equity proceedings by providing that any civil suit, which includes legal and equitable causes of action, is commenced by filing a "complaint" and claims made in responsive pleadings are either "counterclaims," if against the original plaintiff, or "cross-claims," if against a co-defendant.  See Rules 3:1, 3:2, 3:9 and 3:10.

complaint.  The court found "that the proposed amendment would accomplish nothing more than provide [an] opportunity [to the utilities] for reargument of questions already decided and that the proposed amendment seeks determination of disputed issues rather than an adjudication of the parties' rights and is therefore an inappropriate use of declaratory judgment." However, the court granted the utilities leave to file an amended answer to Norfolk Southern's cross-bill, so long as the amended answer did not allege "that [the CTA] is ambiguous, or that the CTA provides for the use of RCAF-A, those issues having been decided by this court."

The utilities filed an amended answer to the cross-bill in which they made extensive allegations regarding the parties' dealings both before and after the execution of the CTA.  Based on these allegations, the utilities contended that Norfolk Southern was estopped from asserting the application of RCAF-U, that Norfolk Southern had implicitly accepted a modification or novation of the CTA requiring the use of RCAF-A, and that Norfolk Southern's actions in this regard constituted fraud in the inducement.  The amended answer also reasserted that Norfolk Southern's claims were barred by the doctrines of laches and waiver and, in whole or in part, by the statute of limitations.

Norfolk Southern filed a motion to strike various allegations relating to actions occurring prior to the execution

of the CTA and allegations that Norfolk Southern had agreed to the use of RCAF-A as the rate adjustment schedule under the agreement. Norfolk Southern contended that these factual allegations were contrary to the circuit court's determination that the CTA was not ambiguous with regard to the specification of RCAF-U as the applicable rate adjustment factor. Thus, Norfolk Southern asserted that these allegations and the affirmative defenses of novation, modification, fraud in the inducement, waiver and estoppel were barred by the doctrine of judicial estoppel. Norfolk Southern also contended that even if these defenses were not barred by judicial estoppel, the allegations of the amended answer were insufficient to establish these defenses as well as the defense of the statute of limitations.

The utilities responded to Norfolk Southern's motion to strike their factual allegations relating to pre-contract events by asserting that it was "facially absurd" to conclude that the circuit court's determination that the CTA was unambiguous in requiring application of RCAF-U to coal transportation rate adjustments at the time of its execution barred the utilities from pleading allegations germane to its affirmative defenses. The utilities next contended that judicial estoppel did not apply because the record did not reflect that the court relied on the assertion that the CTA had not been amended in reaching

its conclusion that RCAF-U was the specified rate adjustment factor. Moreover, they contended that judicial estoppel only bars a party from changing its position after having successfully prevailed under the prior position in the same or prior proceedings, whereas here, the position maintained by the utilities under their bill of complaint had failed. The utilities also asserted that their amended answer contained only pleading in the alternative, and "there is no contradiction between an allegation that a contract was not formally amended and an allegation that it was modified for consideration, by estoppel, or by waiver." Finally, in response to Norfolk Southern's motion to strike the affirmative defenses on alternate grounds, the utilities asserted that they "more than sufficiently pled facts which create a jury question" and therefore Norfolk Southern's alternative motion to strike should be denied.

On November 1, 2005, following additional briefing and oral argument by the parties, the circuit court entered a decree in which it stated that, in construing Article 25 of the CTA, it had relied on the factual assertions in the bill of complaint that the CTA contained the rate adjustment schedule and that schedule had not been amended. The court also held that the amended answer now alleged that the terms of the CTA "were amended after all, whether through theories of estoppel,

12

modification, novation, fraud in the inducement, or waiver." Thus, the court held that the utilities were judicially estopped from taking inconsistent positions in their amended answer from those originally asserted in their bill of complaint and struck the affirmative defenses of estoppel, modification, novation, fraud in the inducement and waiver. The court also granted Norfolk Southern's motion to strike certain factual allegations from the amended answer.[4] The circuit court also found that the grounds stated in Norfolk Southern's alternative motion to strike the utilities' affirmative defenses provided an independent basis to support the court's judgment. The court rejected the statute of limitations defense because Norfolk Southern did not seek damages for any underpayment before December 1, 2003. Finally, the court concluded that the equitable defense of laches would not apply to the legal claim for breach of contract and that, in any case, the utilities had not shown any actual harm caused by Norfolk Southern's delay in enforcing its rights under the contract.

Following entry of the November 1, 2005 decree, the utilities and Norfolk Southern continued to dispute the proper calculation of the rates for coal transportation to the Clover facility. On July 7, 2006, Norfolk Southern filed a motion requesting that the circuit court declare that, based on its

---

[4] The utilities have not appealed this ruling.

13

previous orders, the calculation of the rate to be imposed be based on RCAF-U applied from the inception of the CTA.

The utilities, in a memorandum opposing Norfolk Southern's motion, contended that the issue was not and could not be resolved under the court's prior rulings, that the adjustment of the rates be based on an application of RCAF-U to the rate, as previously adjusted by RCAF-A, in effect in the quarter prior to the December 1, 2003, and requested the matter be set for trial.

The circuit court rejected the utilities' position and entered an order granting Norfolk Southern's motion. The court directed the utilities to "calculat[e] the rates paid under the [CTA] as if the RCAF had been properly applied from the [CTA's] inception." The utilities were further ordered to pay the arrearage from December 1, 2003 along "with interest at the rate provided by the [CTA]," and to pay for all future deliveries of coal to the Clover facility in accord with the court's determination that RCAF-U applied to the rates to be charged from the inception of the CTA.[5]

On June 11, 2007, the utilities filed a motion to vacate the September 1, 2006 order, while on June 27, 2007, Norfolk Southern filed a motion to schedule a status conference to

---

[5] The utilities noted an appeal from this order. This Court dismissed the appeal without prejudice, finding that there was not yet a final, appealable order in the case. VEPCO v. Norfolk Southern Railway Co., Record No. 062501 (May 11, 2007) (order).

14

resolve all pending matters and to enter a final judgment.  The parties filed memoranda supporting their respective positions as to whether the judgment, as expressed in the circuit court's prior orders, should be confirmed by a final judgment, or if the court should set aside its prior determinations and set the matter for trial.  Ultimately, the parties agreed to file a joint submission to the court setting out the matters they agreed had been resolved and those issues that the utilities contended remained in dispute.

On April 17, 2008, the circuit court entered a final order and decree concluding the proceedings on the cross-bill.  In that order, the court, without express comment, denied the utilities' motion for setting aside the prior determinations of the court.  In accord with the stipulations of the parties, the court entered judgment for Norfolk Southern in the amount of $77,708,000 for underpayment of coal delivery rates between December 1, 2003 and November 30, 2007, along with pre-judgment interest of $8,476,222.44 based on the short term prime rate published by J.P. Morgan Bank as provided for in the CTA.  The court also imposed post-judgment interest based on the then applicable statutory rate of 7.5%.  This appeal followed.

## DISCUSSION

We awarded the utilities an appeal from the circuit court's judgment based upon eight separate assignments of error.  The

15

first two assignments of error address the circuit court's rulings regarding the interpretation and ambiguity of the contact. In its third assignment of error the utilities contend that the circuit court erred in striking its affirmative defenses and denying its motion to file an amended bill of complaint. The remaining assignments of error address the court's actions enforcing those rulings and the entry of the judgment with interest against the utilities. We begin with a discussion of the first two assignments of error relating to contract interpretation.

## 1. Contract Interpretation

The utilities' first assignment of error challenges the circuit court's ruling that Article 25 of the CTA specifies that RCAF-U, rather than the RCAF-A, is to be used as the rate adjustment factor for transportation of coal to the Clover facility. In the second assignment of error, the utilities contend that if Article 25 of the CTA does specify RCAF-U as the coal transportation rate adjustment factor, then the court erred in ruling that there is not a latent ambiguity in that article that would permit the utilities to present parol evidence that the parties had intended a different meaning of the rate adjustment factor under the CTA.

In considering the issues raised by the first two assignments of error, we are guided by the well-settled

16

principle that "[t]he interpretation of a contract presents a question of law subject to de novo review." PMA Capital Insurance Co. v. US Airways, Inc., 271 Va. 352, 357-58, 626 S.E.2d 369, 372 (2006). Moreover, it is equally settled that the primary focus in considering disputed contractual language is for the court to determine the parties' intention, which should be ascertained, whenever possible, from the language the parties employed in the contract. Flippo v. CSC Assocs. III, L.L.C., 262 Va. 48, 64, 547 S.E.2d 216, 226 (2001); Langman v. Alumni Ass'n of the Univ. of Va., 247 Va. 491, 498-99, 442 S.E.2d 669, 674 (1994).

The utilities first contend that the circuit court erred in failing to find that Article 25 of the CTA unambiguously specifies that RCAF-U is to be used as the coal transportation rate adjustment factor. This is so, they contend, because the definition of RCAF in the CTA makes clear that the parties understood that there was only one official rate adjustment factor designated by the ICC for coal transportation contracts and, at the time of the execution of the CTA, that was RCAF-A. They point to the language of Article 25 that incorporates into the CTA "the applicable procedures described by the ICC in Ex Parte No. 290 (Sub. No. 2) and published in Title 49 C.F.R., Part 1102, Section 1102.1 and Interstate Commerce Act, Section 10707, as may be amended," contending, as they did in the

17

circuit court, that RCAF-A was created by an amendment of the ICC regulations and superseded RCAF-U. (Emphasis added.) The utilities concede that under the ICC, and subsequently the Surface Transportation Board, RCAF-U continues to be calculated and published, but they contend that this is done only because RCAF-U is a component of RCAF-A and to accommodate contracts that were executed before RCAF-A became the official rate adjustment factor. We disagree.

The circuit court correctly determined that the language of Article 25 expressly and unambiguously incorporates into the CTA "the applicable procedures prescribed by the ICC in Ex Parte No. 290 (Sub. No. 2) and published in Title 49 C.F.R., Part 1102, Section 1102.1 and Interstate Commerce Act, Section 10707." There can be no question that the RCAF-U index is the basis of the "applicable procedures" for determining adjustments to rail freight delivery rates "described by the ICC in Ex Parte No. 290 (Sub. No. 2)," which is the only index described in the reports of those regulatory proceedings. To the extent that the term "as may be amended" can be applied to the entire clause, it is nonetheless clear that this would refer to an amendment of the procedures for calculating and applying RCAF-U under Ex Parte No. 290 (Sub. No. 2).

It is equally clear that had the parties intended for the CTA to incorporate RCAF-A, they could have specified the

18

applicable index as being that "prescribed by the ICC in Ex Parte No. 290 (Sub. No. 4)," which established the procedure for calculating and applying the RCAF-A index. Creation of RCAF-A had been under consideration by the ICC for some time and that the regulations for its calculation and application had been promulgated before the CTA was executed, albeit only by a matter of weeks. Thus, had ODEC and Norfolk Southern intended for the CTA to specify the use of RCAF-A, they could have done so expressly and without the need of any reference to the regulatory process that plainly prescribes RCAF-U. Accordingly, we hold that the circuit court did not err in finding that Article 25 of the CTA unambiguously specifies RCAF-U as the rate adjustment factor for transportation of coal to the Clover facility.

The utilities next contend that if Article 25 of the CTA must be construed as requiring the use of RCAF-U, the circuit court nonetheless erred in failing to find that there was a latent ambiguity in the CTA. They contend that the existence of the latent ambiguity is established by the fact that RCAF-A rather than RCAF-U was used as the rate adjustment factor for the first fourteen years of the contract, and that this course of dealing between the parties reflects their true intent.

An ambiguity exists when the contract's language is of doubtful import, is susceptible of being understood in more than

19

one way or of having more than one meaning, or refers to two or more things at the same time.  Tuomala v. Regent Univ., 252 Va. 368, 374, 477 S.E.2d 501, 505 (1996); Galloway Corp. v. S.B. Ballard Constr., 250 Va. 493, 502, 464 S.E.2d 349, 355 (1995). Normally, an ambiguity in a contact is "patent," that is, the language of the contract itself reveals that it can be interpreted in more than one way.  A latent ambiguity exists where language "while appearing perfectly clear at the time the contract[] [is] formed, because of subsequently discovered or developed facts, may reasonably be interpreted in either of two ways."  Galloway, 250 Va. at 503, 464 S.E.2d at 355; Zehler v. E.L. Bruce Co., Inc., 208 Va. 796, 799 n.5, 160 S.E.2d 786, 789 n.5 (1968).

Quoting from footnote 5 in Zehler, the utilities contend that "[i]f two RCAFs exist, the term 'RCAF' would be 'a term which, upon application to external objects, is found to fit two or more of them equally.'"  Thus, they contend that the circuit court should have found that there was a latent ambiguity in the CTA and looked to the parties' subsequent dealings to determine that, regardless of the apparent meaning of the language of Article 25, the parties' intention at the time of the execution of the CTA was to use RCAF-A as the rate adjustment factor. This is so, they maintain, because "the construction placed upon the ambiguous term by the parties is practically conclusive."

20

The difficulty with the utilities' position on this issue is that it necessarily presumes that at the time of the CTA's execution, the parties were unaware that there was a distinction between RCAF-U and RCAF-A based on an erroneous belief that RCAF-A had superseded RCAF-U as "the RCAF." The parties' subsequent dealings, however, demonstrate that this was not the case. The utilities focus solely on those portions of the parties' subsequent dealings with regard to the CTA that show Norfolk Southern actually used RCAF-A to adjust the rates for coal transportation to the Clover facility until late 2003. However, it is equally clear, especially from the September 1993 negotiations between VEPCO and Norfolk Southern, that the parties knew that RCAF-U was available as to rate adjustment factors for calculating adjustments to the coal transportation rates under the CTA.

The mere fact that RCAF-A was used to calculate the rate adjustments for transportation of coal to the Clover facility for an extended period of time is insufficient to establish that Article 25, which plainly refers to RCAF-U as the rate adjustment factor, must have resulted from a mutual misunderstanding of the parties as to the import of that language. Norfolk Southern's assertion that it applied RCAF-A in making rate adjustments for transportation of coal to the Clover facility initially through forbearance and subsequently

21

by lack of diligence is contrary to the utilities' position that the parties intended for Article 25 of the CTA to specify RCAF-A as the rate adjustment factor. The mere fact that the parties disagree about the meaning of the CTA's terms is not evidence that the CTA language is ambiguous. Pocahontas Mining Ltd. Liab. Co. v. Jewell Ridge Coal Corp., 263 Va. 169, 173, 556 S.E.2d 796, 771 (2002); Galloway, 250 Va. at 502, 464 S.E.2d at 354.

For these reasons, we hold that the circuit court did not err in failing to find that the CTA contained a latent ambiguity and in holding that the CTA unambiguously specifies RCAF-U as the coal transportation rate adjustment factor for the Clover facility.

## 2. Judicial Estoppel

In their third assignment of error, the utilities claim that the circuit court erred in striking certain affirmative defenses on the basis of judicial estoppel and also claim that the alternative reasons given for striking those defenses were error. We begin with the circuit court's ruling that the affirmative defenses of waiver and estoppel are barred by judicial estoppel.[6]

---

[6] The affirmative defenses of novation, modification, fraud in the inducement, estoppel and waiver were struck on the basis of judicial estoppel. However, in this appeal the utilities

22

The doctrine of judicial estoppel prevents a party from assuming successive positions in the course of a suit or series of suits with regard to the same fact or set of facts if those facts are inconsistent or mutually contradictory.  Bentley Funding Group, L.L.C. v. SK&R Group, L.L.C., 269 Va. 315, 325, 609 S.E.2d 49, 53-54 (2005).  The purpose of the doctrine is to protect the integrity of the judicial process.  Parson v. Carroll, 272 Va. 560, 564, 636 S.E.2d 452, 454 (2006).  While this doctrine is widely recognized, it is an equitable doctrine, not amenable to an "exhaustive formula" for determining its applicability.  Bentley Funding Group, 269 Va. at 325-26, 609 S.E.2d at 54 (quoting New Hampshire v. Maine, 532 U.S. 742, 751 (2001)).

In considering this doctrine we have identified certain conditions as prerequisites for its application.  The inconsistent or contradictory assertions must be assertions of fact, not law, Bentley Funding Group, 269 Va. at 326, 609 S.E.2d at 54 (quoting Lowry v. Stovall, 92 F.3d 219, 224 (4th Cir. 1996)), the parties must be the same if the inconsistent positions involve different proceedings, Lofton Ridge, LLC v. Norfolk S. Ry. Co., 268 Va. 377, 382, 601 S.E.2d 648, 651 (2004), and the prior inconsistent position must have been

address only the affirmative defenses of estoppel and waiver.  Accordingly, we limit our review to those two defenses.

23

relied upon by the court or prior court in rendering its decision.  See Bentley Funding Group, 269 Va. at 327, 609 S.E.2d at 54-55.

The inconsistent positions in this case stem from the circuit court's ruling on the utilities' bill of complaint for a declaratory judgment interpreting provisions of the CTA.  In that proceeding the utilities alleged that the CTA was the contract agreed upon by the parties, that the contract contained the contractually agreed upon rate adjustment ratio for the transportation of coal to the Clover Facility, and that the parties had never amended the contract to change the rate adjustment ratio from that contained in the contract.  The circuit court relied on these factual assertions and held that the parties had agreed to be bound by the terms contained in the CTA and that those terms had not been amended.  The circuit court held that the CTA required the use of the RCAF-U rate adjustment ratio.  That was a legal conclusion that differs from the position advocated by the utilities.  Nevertheless, the circuit court's reliance on the utilities' factual assertions in reaching this decision is beyond question.

In the affirmative defenses in their amended answer to Norfolk Southern's cross-bill, the utilities pled that "[t]he parties agreed to use the RCAF-A under the Agreement" and that Norfolk Southern "ratified the parties' agreement to use the

24

RCAF–A under the Agreement." The circuit court held that these assertions of an amendment to the CTA were inconsistent with or contrary to the assertion previously made that the CTA had not been amended.

The utilities argue that the assertion that the CTA had not been amended was not an assertion of fact but an assertion of law and the amended answer only contained "alternative legal theories."[7] However under our case law, the issue of contract amendment is a finding of fact, not of law.[8] See Reid v. Boyle, 259 Va. 356, 368, 527 S.E.2d 137, 144 (2000)(whether contract was amended reviewed applying the clear error standard.) Therefore, the allegations asserting that the CTA was amended are factual assertions inconsistent with the factual assertions made by the utilities in their bill of complaint.

The utilities next argue, citing Bentley Funding Group, that judicial estoppel should not have been applied because judicial estoppel requires "a successful judgment in favor of the non-moving party on any such positions of fact" and the utilities "did not prevail . . . on their purportedly

---

[7] The utilities abandoned the argument made in the circuit court that their allegation that the CTA had not been amended meant only that the CTA had not been amended in writing.

[8] The utilities attempt to distinguish their pleading from an "amendment" of a contract by using words such as "alter" or "modify." These semantic differences do not change the nature of the action alleged which is nothing more or less than an amendment of the contract.

25

inconsistent prior position."  However neither Bentley Funding Group nor any other case has required that the non-moving party secure a favorable judgment based on the prior inconsistent position as a prerequisite for the application of judicial estoppel.  Rather, our cases only require that the court relied upon the prior inconsistent position in rendering a prior judgment or ruling.[9]  In Bentley Funding Group the circuit court found that judicial estoppel should be applied to the defendant's claim that he owned certain escrow accounts because the defendant had not listed those accounts as an asset in a prior bankruptcy proceeding.  269 Va. at 323, 609 S.E.2d at 52. In reversing the circuit court's application of judicial estoppel, this Court's inquiry was directed to whether the prior factual position reflecting non-ownership of the escrow accounts was relied upon by the bankruptcy court in rendering the decision approving a contract for the purchase of property.  See id. at 327-29, 609 S.E.2d at 54-55.  The Court made no mention or inquiry regarding whether the non-moving party received a favorable judgment based on the prior inconsistent position.

The utilities' assertion that application of the doctrine requires that the non-moving party must obtain a "successful judgment" based on the inconsistent position apparently stems

_____

[9] As stated above, the doctrine can be applied in the course of a single action or a series of actions.

26

from certain language used in the Bentley Funding Group opinion to describe the elements and rationale for the application of judicial estoppel.  In this portion of the opinion, the Court in Bentley Funding Group quoted the following passage from New Hampshire v. Maine, 532 U.S. 742, 750-51 (2001):

> Courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled.  Absent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations, and thus poses little threat to judicial integrity.

Bentley Funding Group, 269 Va. at 327, 609 S.E.2d at 54-55. Although this passage uses the phrase "success in a prior proceeding," the context shows that the phrase refers to the prior sentence which addresses the persuasion of the court to accept the nonmoving party's earlier position.[10]  The Court in Bentley Funding Group then went on to say that "[w]ithout the requirement that the prior court accepted the earlier inconsistent position, facts not material or relevant in the prior proceeding could be asserted as a bar to a party's cause

---

[10] The statement from New Hampshire v. Maine was also quoted in Matthews v. Matthews, 277 Va. 522, 529, 675 S.E.2d 157, 161 (2009), in the context of reciting the elements of judicial estoppel.  The doctrine was not applied in that case because the alleged prior inconsistent position was one of law, not fact. Id. at 530, 675 S.E.2d at 161.

27

of action in a later proceeding." Id. at 327, 609 S.E.2d at 55 (emphasis added). Nothing in Bentley Funding Group states or implies that the non-moving party must have succeeded in obtaining a favorable judgment based on the prior inconsistent factual position.

Based on our prior consideration of judicial estoppel, we conclude that application of the doctrine requires only that the prior inconsistent factual position must have been relied upon by the court in reaching its decision. In this case, the circuit court, as reflected in its order, relied on the utilities' position that the CTA was binding on the parties and had not been amended. Therefore that element of judicial estoppel has been met.

Finally, the utilities, citing Lofton Ridge, 268 Va. at 382, 601 S.E.2d at 651, argue that judicial estoppel should not be applied because Norfolk Southern prevailed in its interpretation of the CTA and therefore was not prejudiced by the prior inconsistent position. The utilities' reliance on Lofton Ridge for the proposition that prejudice is a prerequisite for the application of judicial estoppel is misplaced. "Prejudice" is mentioned only three times in the opinion in discussing judicial estoppel. The word first appears in a parenthetical description of another case cited to support the statement that judicial estoppel may bar a litigant from

28

taking inconsistent actions within a single proceeding.  Id. at 381-82, 601 S.E.2d at 650-51.  The second use of the word "prejudice" is found in a statement discussing inconsistent legal theories,[11] and the third appears in a recitation of the appellant's reasons for asserting that judicial estoppel was improperly applied in that case.  Id. at 382, 601 S.E.2d at 651. The Court's holding that the doctrine was improperly applied in Lofton Ridge was based on the lack of identity of parties, not the lack of prejudice.  Id. at 383, 601 S.E.2d at 651-52.  In sum, Lofton Ridge does not incorporate prejudice as a condition for the application of judicial estoppel.

The doctrine of judicial estoppel, as stated above, is a doctrine addressing the integrity of the court and its decrees, preventing litigants from "playing fast and loose" with court rules and litigation strategy.  Wilroy v. Halbleib, 214 Va. 442, 445, 201 S.E.2d 598, 601 (1974) (quoting Rohanna v. Vazzana, 196 Va. 549, 553, 84 S.E.2d 440, 442 (1954)).  It is not a doctrine primarily directed to the interests of the litigants. Nevertheless it is an equitable doctrine and the United States Supreme Court in New Hampshire v. Maine identified prejudice as

---

[11] "However, '[a] person who has taken an erroneous position on a question of law is ordinarily not estopped from later taking the correct position, provided his adversary has suffered no harm or prejudice by reason of the change.' "  Lofton Ridge, 268 Va. at 382, 601 S.E.2d at 651 (quoting The Pittston Co. v.

a "third consideration" that can be used in determining whether the doctrine should be applied. 532 U.S. at 751 (considering "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped"). The Supreme Court did not, however, consider this factor, along with others, as establishing "inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel." Id. Thus, neither this Court nor the United States Supreme Court has made a showing of prejudice a prerequisite to the application of judicial estoppel. Nevertheless, in this case the circuit court found that Norfolk Southern would suffer an unfair detriment if the inconsistent position was advanced because it would incur the expense and delay of relitigating the meaning of the CTA, which the circuit court had already determined in Norfolk Southern's favor.

For these reasons, we conclude that the circuit court did not err in striking the utilities' affirmative defenses because the elements of judicial estoppel were established in this case. Based on this holding, we also reject the utilities' challenge to the circuit court's order entering a protective order with

O'Hara, 191 Va. 886, 904, 63 S.E.2d 34, 43 (1951))(emphasis added).

regard to any discovery on communications prior to the execution of the CTA or alleged amendments subsequent to its execution.

In light of this holding we need not address the circuit court's alternative grounds for striking the defenses of waiver and estoppel.[12]  We turn now to the circuit court's ruling striking the utilities affirmative defense of the statute of limitations.

### 3.  Statute of Limitations

The utilities contend that the circuit court erred in striking their assertion of a plea in bar of the statute of limitations.  The utilities advance two separate theories for the application of the statute of limitations to this case. First, they contend that because the CTA was not a divisible contract, the circuit court should have found that the first breach of the CTA occurred in 1989 when Norfolk Southern first used the RCAF-A to adjust the coal transportation rate and,

---

[12] The utilities did not argue below and do not assert here that, even if the application of judicial estoppel is correct, the affirmative defenses of estoppel and waiver nevertheless remain viable.  Therefore, the issue of whether these affirmative defenses remain viable even after the utilities are precluded from relying on the inconsistent position asserted in those defenses has not been preserved or raised in this appeal and is not before us for review.  Furthermore, the utilities did not assign error to the trial court's ruling striking from the amended answer certain factual allegations upon which the utilities' waiver and estoppel defenses are based.  Therefore, those factual allegations, which are recited in the dissent, cannot be considered in resolving the utilities' legal arguments regarding estoppel and waiver.

thus, Norfolk Southern's breach of contract action is barred as untimely under Code § 8.01-246(2), the applicable five year statute of limitations.  We disagree.

Even accepting the utilities' premise that the CTA is an indivisible contract, it is self-evident that as Norfolk Southern was responsible for calculating the quarterly adjustments to the coal transportation rates, its application of RCAF-A to that calculation prior to December 1, 2003, whether through forbearance or error, would not constitute a breach of the CTA by either Norfolk Southern or the utilities.  Moreover, Norfolk Southern has consistently acknowledged that it is entitled to seek damages for underpayment only from December 1, 2003, the date on which it first made the demand that the utilities begin paying for the transported coal applying the RCAF-U rate.  It is only by virtue of the utilities' failure to accede to that demand that an actionable breach of the CTA could have occurred.  Thus, we hold that the circuit court did not err in rejecting the utilities' assertions that the statute of limitations barred Norfolk Southern's breach of contract claim entirely.[13]

---

[13]In light of our disposition of the various issues on this appeal, we need not address the utilities' further contention that the statute of limitations would bar Norfolk Southern from retroactively applying RCAF-U to adjust the coal transportation rates from the inception of the CTA even if Norfolk Southern has not waived its ability to do so.

32

### 4.  Amended Bill of Complaint

The utilities assert that the circuit court erred in refusing to allow the utilities to file an amended bill of complaint following the circuit court's ruling on Norfolk Southern's demurrer.  The utilities argue that in the proposed amended bill of complaint they pled "additional facts and theories regarding new matters not contained in the original Bill of Complaint."  Specifically, the utilities argued that they "alleged new facts to establish estoppel, waiver, and other theories" in support of their claims and that none of these facts or theories were raised in the original bill of complaint.  According to the utilities, the circuit court abused its discretion in denying the utilities leave to amend because the utilities were entitled to pursue them "as independent claims to insure that their rights were fully and finally declared, rather than be relegated to the status of cross-bill defendants."  Concluding, the utilities aver that absent any prejudice to Norfolk Southern, and absent any finding that the new theories were legally deficient, the circuit court abused its discretion in denying leave to amend.

After reviewing the proposed amended bill of complaint, the circuit court concluded that it "would accomplish nothing more than provide opportunity for reargument of questions already decided."  The circuit court also concluded that the proposed

amendment was not an appropriate use of the declaratory judgment mechanism because it sought determination of disputed issues rather than adjudication of the parties' rights.

The new factual allegations and legal theories in the proposed amended bill of complaint were essentially identical to those contained in the amended answer to the cross-claim. Many of the new factual allegations related to Norfolk Southern's actions which the utilities asserted modified the terms of the agreement, an issue already decided as noted by the circuit court. Claims of estoppel, modification, novation, and fraud in the inducement contained in the proposed amended complaint are, as noted by the circuit court, not determinations of rights, and thus are not appropriate for a declaratory judgment proceeding. Accordingly, the circuit court did not abuse its discretion in denying the utilities' motion to file an amended bill of complaint.

### 5.  Calculation of Damages

Assignments of Error Nos. 4, 5, and 6 are based on essentially one issue: the circuit court's conclusion that Norfolk Southern was entitled to calculate the damages it claimed – underpayments by the utilities since December 1, 2003 – by applying the RCAF-U rate adjustment schedule from the inception of the agreement in 1989. Utilizing the RCAF-U rate adjustment schedule as ordered by the circuit court resulted in

underpayments of $77,708,000, as stipulated by the parties. Utilizing the RCAF-U rate to adjust the rates beginning in December 1, 2003 results in under payments of $3,816,000, according to the utilities.[14]

In July 2006, Norfolk Southern filed a motion for further relief and enforcement of orders, asserting that the circuit court's prior orders granting Norfolk Southern's demurrer to the utilities' bill of complaint, holding that the CTA required the application of the RCAF-U rate adjustment schedule, denying the utilities' motion to file an amended bill of complaint, and striking the utilities' affirmative defenses left "nothing to be done in the case except to superintend ministerially" the circuit court's orders.  Norfolk Southern sought an order compelling the utilities to make the payments due Norfolk Southern "from December 1, 2003 forward in accordance with the rate adjustments provided by the [CTA]."  The utilities opposed this motion arguing that the circuit court's prior orders did not resolve the measure of Norfolk Southern's claimed damages, specifically how the RCAF-U should be used in calculating those damages.  The utilities relied on the prospective nature of the non-waiver provision and Paragraph 25 of the CTA.  Paragraph 25

---

[14] The parties presented a stipulation to the court regarding the damage calculation based on application of RCAF-U from the inception of the contract and the utilities proffered

provides that the rate per ton shall be set for each calendar quarter by adjusting the previous quarter's rates. The utilities argued that the RCAF-U rate schedule should have been utilized for determining underpayments beginning with rates existing in the calendar quarter prior to December 1, 2003, the date Norfolk Southern chose to assert the application of the RCAF-U rate schedule.

The circuit court, by order entered September 1, 2006, agreed with Norfolk Southern and ordered that the RCAF-U rate adjustment schedule be utilized to calculate the underpaid amounts from December 1, 2003 as if the RCAF-U schedule had been used since the inception of the CTA. In appealing this ruling, the utilities claim the circuit court erred in allowing Norfolk Southern to apply the RCAF-U schedule from the inception of the CTA in determining its damages, in refusing to vacate its September 1, 2006 order, and in refusing to allow certain discovery and submission of evidence.

We find that the circuit court's order was erroneous. The court's prior orders did not address the amount of damages to which Norfolk Southern was entitled under its cross-claim and did not address the manner in which those damages should be calculated. Only when the manner of calculating damages is

_____

the evidence regarding the amount of damages resulting from applying RCAF-U from December 1, 2003.

determined would further action be merely the ministerial superintending of the calculation.

The manner in which the underpayments should be calculated is, under the CTA, a matter of contract interpretation. As the utilities assert, two provisions of the CTA are relevant to this determination. Paragraph 25 provides in part that the specific rates contained in the agreement "shall be retained or adjusted up or down on a quarterly basis." The adjustments are to be made on the first day of each quarter. This provision requires adjustment of rates every quarter. In this case, the rates were adjusted every quarter, applying the RCAF-A adjustment ratio. Thus, the contract term requiring rate adjustment every quarter was satisfied.

The second provision, Paragraph 5, is a non-waiver provision. That provision provides that the "failure of either Party to demand strict performance of any or all of the terms of this Agreement . . . shall not be construed as a waiver or relinquishment of that Party's right to assert or rely upon any such right in the future." This section allows a contracting party to forego application of a term of the agreement but assert the term and demand compliance with it in the future. Therefore, the provisions of the CTA specifically allowed Norfolk Southern to accept an adjustment rate other than RCAF-U and then require the use of the contract specified rate, RCAF-U,

for future rate adjustments.  The CTA does not, however, permit readjusting an already completed rate adjustment when a party later seeks to enforce a right which it did not previously enforce.  To the contrary, the contract terms preclude retroactive enforcement of a previously unclaimed right.

For these reasons, we will reverse the decision of the circuit court requiring the application of RCAF-U to the CTA from its inception in determining the amount of underpayment to which Norfolk Southern is entitled and order that RCAF-U be applied beginning December 1, 2003, in determining the amount of underpayment to which Norfolk Southern is entitled.

## 6.  Interest

In their last assignments of error the utilities challenge the circuit court's orders imposing pre- and post- judgment interest.  They argue that they should not be required to pay pre-judgment interest because Norfolk Southern did not make a specific claim for unpaid amounts until December 2007 or otherwise present invoices showing any underpayment.  The utilities also argue that pre-judgment interest is only authorized under the CTA if the utilities are late in paying.  Because Norfolk Southern never presented invoices for the amounts now claimed until the "eve of trial," the utilities contend that their payments could not have been late.

38

The utilities argue that post-judgment interest should not have been imposed because Paragraph 30 of the CTA provides that interest is payable if a party fails to comply with the contract by delaying payment. They also assert that the contract sets the interest rate as the Chase Manhattan Bank short-term prime rate in effect the first day after payment was due until the day the delay is cured. The utilities claim that Norfolk Southern provided no evidence as to the requisite Chase Manhattan rate and therefore post-judgment interest should not be 7.5% but the 6.0% rate specified in Code § 6.1-330.54.

The award of pre-judgment interest is a matter of judicial discretion. See Code § 8.01-382; Upper Occoquan Sewage Auth. v. Blake Constr. Co., 275 Va. 41, 63-64, 655 S.E.2d 10, 23 (2008); City of Richmond v. Blaylock, 247 Va. 250, 253, 440 S.E.2d 598, 599 (1994). Under the circumstances of this case, we cannot conclude that the circuit court abused its discretion in the pre- and post- judgment interest rates awarded. Furthermore, with regard to post-judgment interest, the utilities acknowledged the Chase Manhattan rate in the stipulations it presented to the circuit court. While the amount of interest would vary from that stated in the order in light of our conclusion regarding the basis for calculating damages, nevertheless, we affirm the circuit court's imposition of pre- and post- judgment interest rates.

CONCLUSION

To summarize, we will affirm the judgment of the circuit court holding that the CTA is unambiguous and requires the use of RCAF-U rate adjustment schedule; striking the affirmative defenses of waiver and estoppel because they are barred by the doctrine of judicial estoppel; striking the affirmative defense of the statute of limitations; and denying the utilities' motion to file an amended bill of complaint.  We reverse the circuit court's ruling regarding the calculation of damages and hold that the damages to which Norfolk Southern is entitled shall be calculated by applying the RCAF-U adjustment rate beginning December 1, 2003.  Finally, we will affirm the circuit court's decision to impose pre- and post-judgment interest. Accordingly, we will remand the matter to the circuit court for further proceedings consistent with this opinion.

<u>Affirmed in part,</u>
<u>reversed in part,</u>
<u>and remanded.</u>

JUSTICE KOONTZ, with whom CHIEF JUSTICE HASSELL and JUSTICE MILLETTE join, concurring in part and dissenting in part.

I respectfully dissent.  Article I, Section 11 of the Constitution of Virginia provides, in pertinent part:  "That in controversies respecting property, and in suits between man and man, trial by jury is preferable to any other, and ought to be held sacred."  Today, in my view, a majority of this Court

40

effectively permits a circuit court to deny a party to a contract dispute the right to a trial by jury on the merits of that party's assertion of the affirmative defenses of equitable estoppel and waiver. I cannot join a decision that results in the denial of such a fundamental right based upon what I believe to be the inappropriate application by the circuit court of the equitable doctrine of judicial estoppel in the factual and procedural context of this case.

The pertinent procedural facts from which the issue arises are undisputed and may be fairly distilled to the following summary. The utilities initially filed in the circuit court a bill of complaint against Norfolk Southern seeking a declaratory judgment that the parties' contract regarding the transportation of coal to the utilities' electricity generating facility in Clover, Virginia required the application of the Rail Cost Adjustment Factor – Adjusted ("RCAF-A") for calculating quarterly adjustments to the coal transportation rates. At the time this contract was executed, the parties had been free to select either RCAF-A or the Rail Cost Adjustment Factor – Unadjusted ("RCAF-U"); the latter rate factor would result in a higher rate for the transportation of coal. The utilities maintained in the bill of complaint that the rate factor to be applied under the contract was RCAF-A and that the contract had not been amended to provide for the application of any other

41

rate factor. Norfolk Southern filed a demurrer to the bill of complaint asserting that the contract unambiguously required the application of RCAF-U. The circuit court granted the demurrer.

Norfolk Southern also filed a cross-bill seeking specific performance of the contract using RCAF-U to adjust the future coal transportation rates under the contract and damages for breach of contract for all amounts allegedly underpaid by the utilities resulting from the application of RCAF-A rather than RCAF-U. The utilities filed an amended answer to the cross-bill asserting, among other things, that Norfolk Southern's breach of contract claims were barred by equitable estoppel and/or waiver. The circuit court held that the utilities were judicially estopped from taking "inconsistent positions" in their amended answer from those originally asserted in their bill of complaint and, accordingly, struck the utilities' affirmative defenses of equitable estoppel and waiver.

The majority now concludes that "the circuit court did not err in striking the utilities' affirmative defenses [of equitable estoppel and waiver] because the elements of judicial estoppel were established in this case." In reaching that conclusion, the principal focus of the majority's analysis is that the circuit court relied upon the utilities' position that the parties' contract had not been amended and, thus, that the

42

utilities had asserted inconsistent factual positions in their bill of complaint and their amended answer.

In my view, when these pleadings are considered in context there is no inconsistency in the assertions made by the utilities so as to support the application of judicial estoppel in this case. It is simply not inconsistent to assert, on the one hand, that the contract required the application of RCAF-A and had not been amended and, on the other hand, to assert that under the facts of the case Norfolk Southern is nevertheless estopped from relying upon the application of RCAF-U and/or has waived the application of RCAF-U in favor of the application of RCAF-A. In short, even though the utilities erroneously maintained in their bill of complaint that the parties' contract required the application of RCAF-A rather than RCAF-U, their affirmative defenses of estoppel and waiver addressed an entirely different legal issue which was whether Norfolk Southern could recover damages based on the application of RCAF-U after the utilities had paid and Norfolk Southern had accepted payments under the contract derived from the application of RCAF-A for fourteen years. Clearly, in the absence of judicial estoppel, the utilities had a right to submit the merits of those defenses to a jury for resolution.

" '[J]udicial estoppel forbids parties from assuming successive positions in the course of a suit, or series of

43

suits, in reference to the same fact or state of facts, which are inconsistent with each other, or mutually contradictory.'" Bentley Funding Group, L.L.C. v. SK&R Group, L.L.C., 269 Va. 315, 325, 609 S.E.2d 49, 53-54, (2005) (quoting Lofton Ridge, LLC v. Norfolk S. Ry. Co., 268 Va. 377, 380-81, 601 S.E.2d 648, 650 (2004)); see also Matthews v. Matthews, 277 Va. 522, 529, 675 S.E.2d 157, 160 (2009) (same). "The fundamental element of judicial estoppel is that 'the party sought to be estopped must be seeking to adopt a position that is inconsistent with a stance taken in a prior litigation. And the position sought to be estopped must be one of fact rather than law or legal theory.' " Bentley Funding Group, 269 Va. at 326, 608 S.E.2d at 54 (quoting Lowery v. Stovall, 92 F.3d 219, 224 (4th Cir. 1996)); accord Lofton Ridge, 268 Va. at 382, 601 S.E.2d at 651.

I agree, as noted by the majority here in citing Wilroy v. Halbleib, 214 Va. 442, 445, 201 S.E.2d 598, 601 (1974), that "[t]he doctrine of judicial estoppel . . . is a doctrine addressing the integrity of the court and its decrees, preventing litigants from 'playing fast and loose' with court rules and litigation strategy." The record in the present case, however, does not support a conclusion that the utilities were engaged in such conduct by asserting their affirmative defenses. Certainly in view of the facts as stated in their amended

44

answer, the assertion of these defenses was not facially frivolous.

In Peerless Insurance Co. v. County of Fairfax, 274 Va. 236, 246, 645 S.E.2d 478, 484 (2007), we recently stressed that the fundamental element of judicial estoppel is that the party sought to be estopped is seeking to adopt a factual position inconsistent with a stance it took in the course of a particular suit.  Judicial estoppel does not apply to a position of law or legal theory.  Bentley Funding Group, 269 Va. at 326, 608 S.E.2d at 54.  Here, the utilities were not seeking to adopt an inconsistent factual position by the assertion of their affirmative defenses to Norfolk Southern's breach of contract claims.  Rather, the utilities were maintaining that the fact the utilities paid and Norfolk Southern accepted payments based on RCAF-A rates for fourteen years supported the legal theory of their defenses.  If proven, this course of dealing between the parties is a matter entirely independent from the dispute over the interpretation of the contract language and, therefore, was properly asserted by the utilities as an alternate legal theory to that asserted in their bill of complaint.

Moreover, the record does not support the circuit court's conclusion, with which the majority apparently agrees, that Norfolk Southern would suffer an unfair detriment if the utilities were permitted to submit their affirmative defenses

45

for resolution on their merits to a jury because Norfolk Southern would incur the expense and delay of relitigating the meaning of the parties' contract.  In my view, this conclusion misses the point.  The utilities have never been afforded the opportunity to have their defenses to Norfolk Southern's breach of contract claim resolved on the merits by a trial by a jury.

Because the circuit court denied the utilities the opportunity to develop a factual record by the introduction of evidence, the question then becomes whether the amended answer to the cross-bill adequately pled the affirmative defenses of equitable estoppel and/or waiver.  "[A] party seeking to invoke the doctrine of estoppel must prove by clear, precise, and unequivocal evidence the following elements:  (1) A material fact was falsely represented or concealed; (2) The representation or concealment was made with knowledge of the facts; (3) The party to whom the representation was made was ignorant of the truth of the matter; (4) The representation was made with the intention that the other party should act upon it; (5) The other party was induced to act upon it; and (6) The party claiming estoppel was misled to his injury."  Boykins Narrow Fabrics Corp. v. Weldon Roofing & Sheet Metal, Inc., 221 Va. 81, 86, 266 S.E.2d 887, 890 (1980).

In the allegations supporting their affirmative defense of equitable estoppel, the utilities alleged, among other things,

46

that the utilities were induced to locate the Clover facility where it could be serviced by Norfolk Southern, rather than by another railway company with which the utilities were also negotiating for coal transportation, based on an alleged representation by Norfolk Southern that RCAF-A would be used as the rate adjustment factor permanently, rather than as a temporary accommodation as Norfolk Southern later maintained. Similarly, the utilities alleged that VEPCO agreed to acquire its interest in the Clover facility based on express representations by Norfolk Southern that RACF-A would be the permanent rate adjustment factor. The utilities alleged that the Clover facility was constructed at considerable expense and in reliance on these representations. Furthermore, the utilities alleged that Norfolk Southern's actions and representations over the next fourteen years were consistent with these representations.

The circuit court ruled that the allegations in the amended answer were not sufficient to support the claim of equitable estoppel because the utilities' reliance on any statements by Norfolk Southern, in light of the unambiguous specification of RCAF-U as the coal transportation rate adjustment factor contained in the parties' contract, would be "wholly unreasonable." I disagree. Even when a contract is unambiguous, a party nevertheless may be misled by the

47

deliberate misrepresentations of another as to the intended application of its terms and be induced to enter into the contract or make other changes in position as a result of those misrepresentations.  Though ultimately unsuccessful, the utilities' claim in this case that the contract specified RCAF-A and not RCAF-U as the rate adjustment factor was not frivolous and, as alleged in their amended answer, their reliance on statements and actions by Norfolk Southern that supported that view would not be unreasonable.  If the utilities can establish that their misapprehension of the contract's specification for the rate adjustment factor was in fact the result of deliberate misrepresentations by Norfolk Southern, then they could establish the necessary elements of equitable estoppel. Accordingly, I would hold that the circuit court erred in striking the utilities' affirmative defense of equitable estoppel.

Similarly, the circuit court's determination that the contract's "non-waiver" provision[*] barred the utilities from asserting that Norfolk Southern had waived its right to apply RCAF-U as the rate adjustment factor erroneously short circuited

---

[*] Article 5 of the contract provides that:  "The failure of either Party to demand strict performance of any or all of the terms of this Agreement, or to exercise any or all rights conferred in this Agreement, shall not be construed as a waiver or relinquishment of that Party's right to assert or rely upon any such right in the future."

48

the fact finding process. The utilities contend that a party to a contract may, expressly or by its conduct, waive any provision of the contract, including a "non-waiver" provision, and that they sufficiently alleged that Norfolk Southern, by its representations, actions, and course of dealing had done so with regard to its right under the contract to apply the RCAF-U rate adjustment factor.

As counterintuitive as the assertion initially may appear, it is a correct statement of the law. Generally, a party to a contract may waive any right conferred by the contract. Because the right is to the benefit of the party, the right may be waived by the party either expressly or impliedly by conduct, acts, or course of dealing inconsistent with the conferred right. When it is clearly established that the party charged with relinquishment of a right conferred by the contract had knowledge of the right and intended to waive it, the waiver will be enforced. Roenke v. Virginia Farm Bureau Mut. Ins. Co., 209 Va. 128, 135, 161 S.E.2d 704, 709 (1968); Woodmen of the World Life Ins. Soc. v. Grant, 185 Va. 288, 299, 38 S.E.2d 450, 454 (1946). Thus, a party may waive a non-waiver provision of a contract such as the one contained in the contract in this case.

The utilities' allegations that Norfolk Southern waived its right to apply RCAF-U as the rate adjustment factor entirely or to apply it retroactively to the calculation of the rate

49

beginning in December 2003, necessarily included the assertion that Norfolk Southern did so with the intention of waiving both that right and the right to assert the non-waiver provision of the contract.  While this may be difficult for the utilities to establish to the satisfaction of the trier of fact after a full development of the record, the allegations in their amended answer to the cross-bill are sufficient to permit the utilities the opportunity to do so.  Accordingly, I would hold that the circuit court erred in striking the utilities' assertion of the affirmative defense of waiver.

For these reasons, I would reverse the judgment of the circuit court applying the doctrine of judicial estoppel and striking the utilities' affirmative defenses of equitable estoppel and waiver.  I would remand the case to the circuit court to permit the utilities the opportunity, as requested in their amended answer, to have the merits of those defenses determined in a trial by jury.  In all other respects, excepting that a finding of estoppel or waiver would bar any recovery by Norfolk Southern, I concur with the majority opinion on the issues presented and for the reasons stated.